## McCHAREN v. MEAD.  (No. 7411.)

(Court of Civil Appeals of Texas. San Antonio. June 18, 1925. Rehearing Denied July 6, 1925.)

**1. Elections ⬅=177—Writing of initials on ballot by presiding judge held substantial compliance with requirement that he write his "signature."**

The writing by presiding judge of his initials only on ballots to be voted *held* a substantial compliance with Rev. St. arts. 3001, 3005, 3011, requiring him to write his "signature."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Sign—Signature.]

**2. Elections ⬅=83—Payment of poll tax in county other than that of residence on 1st of January purely voluntary, not satisfying statute.**

Under Rev. St. arts. 2997, 7615, and Vernon's Ann. Civ. St. Supp. 1922, arts. 2942, 7354, voters who were residents of C. county on 1st day of January, and removed to W. county later in year, were not subject to poll tax in W. county for that year, and payment thereof is voluntary, not satisfying provisions of statute.

**3. Elections ⬅=83—That levy of poll tax not made until October 8th held not to invalidate it.**

That commissioner's court of county in which voters resided on 1st day of January did not make levy of poll tax until October 8th did not invalidate levy, thus entitling voters, who later removed to another county and paid poll tax therein, to vote, as Rev. St. arts. 2997, 7615, and Vernon's Ann. Civ. St. Supp. 1922, arts. 2942, 7354, fixes no specific period for making levy.

**4. Taxation ⬅=55—Where it was not shown in support of discrimination that tax collector began collection of taxes prior to date of levy, presumed that he did not do so.**

Where levy of poll tax under Rev. St. arts. 2997, 7615, and Vernon's Ann. Civ. St. Supp. 1922, arts. 2942, 7354, was not made until October 8th, and it was not shown in support of claim of discrimination that tax collector began collection of taxes prior to date of levy, it will be presumed that he did not do so until levy was made and he was supplied with appropriate assessment rolls.

**5. Elections ⬅=83—Persons not paying poll taxes in county of their residence on 1st day of January held not entitled to vote at election of ensuing year.**

Voters who resided in C. county on 1st day of January, but removed to W. county later in year, *held* not entitled to vote in W. county in election of ensuing year, in view of Rev. St. arts. 2997, 7615, and Vernon's Ann. Civ. St. Supp. 1922, arts. 2942, 7354, where they did not pay their poll taxes in C. county.

**6. Elections ⬅=239—Ballot, not voted by person to whom issued, properly excluded.**

Where person to whom ballot was issued did not vote it, but ballot appeared among returns fully marked, such ballot was properly excluded.

**7. Appeal and error ⬅=742(1)—Evidence supporting conclusion asserted in counsel's statement should be set out for inspection.**

It being for appellate court and not for counsel to draw conclusions from specific evidence of disputed facts, where there is any evidence in record to support conclusions asserted by counsel in statement in support of proposition, it should be set out for inspection.

**8. Elections ⬅=83—Timely payment of poll tax in county of removal entitles voters to vote therein, where no showing of levy of tax in county from which they removed.**

The levy of a poll tax under Rev. St. arts. 2997, 7615, and Vernon's Ann. Civ. St. Supp. 1922, arts. 2942, 7354, being purely permissive and not mandatory, where there was no affirmative showing that county of voters' residence on 1st day of January levied such a tax, timely payment of tax by such voters in county to which they later removed entitled them to vote in latter county.

**9. Elections ⬅=73—One removing to foreign state for 18 months, expressing intention to make home there, and returning a few days before election, held not a resident entitled to vote.**

Finding that voter, who, 18 months before election, left with her husband for foreign state, stating that she was going back to make her home with her children, and remained there until a few days before election, was not a resident of state entitled to vote will not be disturbed.

**10. Elections ⬅=73—Wife returning to county after residence in foreign state, and intending to rejoin husband there, held not a resident entitled to vote.**

Wife, who spent 18 months in Florida with her husband, and returned before election without her husband, and expected to rejoin him in Florida, *held* not a resident entitled to vote.

**11. Elections ⬅=72—Facts held to show that voter was not resident of another county, but merely a transient.**

Member of bridge gang, who ate and slept in railroad car, which was never stationed in any particular county, *held* a transient, and not a resident of county of his father's home, which he had not visited for three years, requiring him to pay poll tax therein, and hence his timely payment of tax in another county, where he permanently settled in September, 1923, entitled him to vote in election therein in November, 1924.

**12. Elections ⬅=73—That husband away from home most of time because of work held not to show an abandonment by family of their home as respected right to vote.**

Where husband and wife acquired homestead to be paid for in monthly installments, but husband worked wherever he could, and was thus kept away from homestead most of time, but with no intent to give up home, *held*, that there had been no abandonment of their home and residence, as respected their right to vote.

**13. Elections ⊕73—Abandonment of residence in county held not shown.**

Where wife, expecting to give birth to a child, went to her mother in adjoining county, but husband remained in county of their residence, until several weeks after election, though discharged from his position two days before election, *held*, that there was not an abandonment of their residence in such county, rendering their votes invalid.

**14. Elections ⊕70—Alien child of alien parents held not qualified voter.**

One, born in Mexico of Mexican parents, and whose father never was naturalized, *held* not a qualified voter.

**15. Elections ⊕295(1)—Explanation of duplicate numbered ballots held sufficient to entitle them both to be counted.**

Where two ballots were numbered 128, and husband testified that his wife, given number 127 on tally list, immediately preceded him in voting, that she voted, and he recognized one of ballots numbered 128 to be ballot cast by him, *held*, that there was a satisfactory identification and explanation of such duplicate numbered ballots, and they both were entitled to be counted.

Appeal from District Court, Willacy County; W. B. Hopkins, Judge.

Election contest by W. E. McCharen against W. H. Mead. Judgment for defendant, and plaintiff appeals. Affirmed.

B. D. Tarlton, of Corpus Christi, J. P. Cogdell, of Raymondville, and Bill Sutherland, of Corpus Christi, for appellant.

Graham, Jones, Williams & Ransome, of Brownsville, and D. E. Decker, of Raymondville, for appellee.

SMITH, J. As a result of the general election held in Willacy county in November, 1924, appellee, Mead, was declared by the commissioners' court to have been elected, and given a certificate of election, to the office of county judge and ex officio superintendent of public instruction by a majority of one vote over appellant, McCharen, his only opponent. The latter filed a contest of the election in the district court, where judgment was rendered in favor of Mead, whose majority was therein fixed at 6 votes, the count standing 262 for Mead and 256 for McCharen. The latter has appealed. Appellant assails the legality of certain votes counted below, and asserts the legality of other ballots excluded.

[1] A majority of the votes cast and counted were indorsed with the initials only of the presiding judges, and appellant contends that such ballots were invalid, on the ground that such indorsement was not in compliance with the mandatory requirement of the statutes. that all ballots shall bear the signature of the presiding judges of the precincts in which the ballots are cast, and shall not be counted unless so indorsed. Articles 3001, 3005, 3011, R. S. We overrule this contention for the reasons given in the opinion rendered in this court on June 12, 1925, in cause No. 7412, Joe Turner v. R. H. Teller, 275 S. W. 115, involving the same election and ballots. Appellant's first proposition of law, in which this question is presented, will be overruled. This leaves in dispute the ballots of 17 other voters questioned here by appellant, to wit, Mrs. Julia Oberg, Manuel Seis, Mrs. J. M. McDowell, H. C. Smith, Mrs. G. F. Morse, E. E. Campbell, A. N. Davis, Mrs. A. N. Davis, J. H. Ransom, N. R. Kleman, Mrs. Ramona Kleman, R. P. Alcantar, O. W. Jones, Mrs. O. W. Jones, J. B. Pollock, W. L. Skipper, and Mrs. W. L. Skipper.

It is provided by statute that a poll tax shall be levied and collected from all persons, with certain exceptions, residing within the state on the 1st day of January of each year (article 7354, Ver. Civ. St. 1922 Supp. p. 2010), and that such tax shall be paid at any time between the 1st day of October of such year and the 1st day of February of the succeeding year. Article 2942, Id. It is further provided that the tax collector "of each county shall begin the collection of taxes annually on the first day of October, or so soon thereafter as he may be able to obtain the proper assessment rolls, books or data upon which to proceed with the business." Article 7615, R. S. It is also provided that no citizen shall be permitted to vote at any election, unless he first presents to the election judge his poll tax receipt or certificate of exemption of the previous year issued to him before the 1st day of February of the year in which he offers to vote. Article 2997, R. S. With relation to the foregoing provisions, it appears from the record that R. P. Alcantar, O. W. Jones, Mrs. O. W. Jones, N. R. Kleman, and Mrs. Ramona Kleman were residing in Cameron county on the 1st day of January, 1923, but did not pay a poll tax in that county for that year; that later in the year they removed to Willacy county, and paid a poll tax in that county before the 1st day of February, 1924, being the year of the election. These electors voted in the election in 1924, casting their ballots for appellant. These ballots were excluded below, and appellant now challenges the action of the court thereon, insisting that the ballots were legal, and should be credited to him.

[2] According to the decisions, and appellant concedes the rule to be applicable here, the voters mentioned were obligated to pay their poll tax for the year 1923 to Cameron county, since they were residents thereof on the 1st day of January, 1923; that they were not subject to the tax in Willacy county for that year, not being residents thereof on the 1st day of January; and that payment there-

of was purely voluntary, and did not satisfy the plain provision of the statute requiring the payment of the tax to the county in which they resided on the 1st day of January of the year of the levy. Linger v. Balfour (Tex. Civ. App.) 149 S. W. 795.

[3] But appellant seeks to avoid the force of this rule by showing that, while the commissioners' court of Cameron county levied the poll tax for the year 1923, it did not actually make the levy until October 8th thereof; and it is contended that, because the levy was not made earlier in the year, it was ineffectual, was not a legal levy, and that under a holding of this court in Savage v. Umphries (Tex. Civ. App.) 118 S. W. 893, the voters in question were not required to pay their poll taxes in Cameron county, and the payment of a tax in Willacy county, although they were not residents thereof on January 1st, entitled them to vote in that county. The statutes, however, fix no specific period of time within which the levy shall be made, and we think the fact that it was not made in Cameron county until October 8th did not invalidate it. We overrule this contention made by appellant.

[4, 5] It is further contended that, because the tax was not levied until October 8th, it became discriminatory and in contravention of the constitutional requirement that all taxes must be equal and uniform, in that those who desired to do so, by paying their tax between October 1st and October 8th, the date of the levy, could have thereby escaped the county tax of .25 cents, which was compulsory upon those who paid after the latter date. No evidence is pointed out from which it may be inferred that the tax collector began the collection of taxes prior to the date of the levy, however, and it will be presumed that he did not do so until the levy was made and he was supplied with the appropriate assessment rolls, etc., as provided in article 7615. We overrule this contention, and hold that, because the five named voters did not pay their poll taxes in Cameron county, in which they resided in the year of the levy, they could not legally vote in Willacy county in the election of the ensuing year. These matters are presented in appellant's second proposition of law, which is overruled.

[6] In his fourth proposition appellant complains of the exclusion of ballot No. 5, purporting to have been cast for appellant by Mrs. J. McDowell in precinct 1. It was marked for appellant, but not counted as a vote. Upon the tally list the ballot is shown as "5. Mrs. McDowell, disqualified." Mrs. McDowell testified that at the polling place a ballot was handed her by an election official, but before she could or did mark it some one took it from her, and she thereupon left the polling place, and did not vote at all. The ballot appeared among the returns, fully marked, however. The record shows that Mrs. McDowell, to whom the ballot was issued, did not vote it, and the trial court correctly excluded it. The fourth proposition is overruled.

Appellant complains of the exclusion of the ballot cast for him by one H. C. Smith. The voter had paid no poll tax entitling him to vote, but claimed exemption, and presented a certificate thereof, upon the ground that he was "permanently disabled," for which provision is made in article 2942, R. S. There was much evidence concerning the issue of Smith's condition as to disability, and the trial court resolved the issue against appellant. The evidence fully supported the court's finding that Smith was not in a permanently disabled condition, as contemplated by the statute. This is the identical H. C. Smith who was held by this court to be not entitled to exemption upon this ground in Huff v. Duffield, 251 S. W. 298. Appellant's fifth proposition is overruled.

[7] Complaint is made because of the refusal of the trial court to exclude the ballot cast by J. B. Pollock upon the ground that he was a resident of one precinct, but voted in another. The trial court found that Pollock resided and voted in the same precinct. Appellant's statement under this proposition is that—

"The uncontradicted evidence of J. B. Pollock shows that the voter, J. B. Pollock, was a single man, and that he lived at Lyford in voting precinct No. 3, and, notwithstanding he lived in voting precinct No. 3, he voted in precinct No. 1. We submit that the honorable trial court was in error in not excluding this ballot."

If there was evidence in the record to support the conclusion asserted in this statement, it should have been set out for inspection, as it is for this court and not for counsel to draw enforceable conclusions from specific evidence of disputed facts. The ninth proposition of appellant is overruled.

[8] W. L. Skipper and wife, whose votes were cast and counted for appellee, were residents of Victoria county on January 1, 1923, and remained such until late in October of that year, when they removed to Willacy. They did not pay a poll tax in Victoria, but did pay it to Willacy county. These voters were in the same situation as to residence as Alcantar and four others, who are described in appellant's second proposition and hereinabove adverted to. If a county poll tax was levied in Victoria county, as it was in Cameron county in Alcantar's case, then the Skippers were obliged to pay the tax to Victoria county, and payment to Willacy did not satisfy the statute. Linger v. Balfour, supra. But there is no affirmative showing that a county poll tax was levied in Victoria county for 1923, and, as the levy of such tax is not mandatory, but is purely permissive, resting

entirely within the discretion of the commissioners' court, there is no presumption that such levy was made in Victoria county for 1923. This relieved the Skippers of any obligation to pay the Victoria county tax, and their timely payment of the state tax in Willacy county entitled them to vote in that county. Savage v. Umphries, supra. The ballots of the Skippers were therefore properly counted for appellee, and appellant's eighth proposition is overruled.

[9] The trial court excluded the ballot cast for appellant by Mrs. G. F. Morse upon the ground that she was not a resident of the state. The record shows that this voter and her husband had previously resided in Willacy county for four years, and owned a home there; that about 18 months before the election she sold her furniture, or most of it, storing the remainder there, but did not sell her home; told a neighbor that she was going back North to make her home with her children. She and her husband left a few days later for New York state, where they remained for a period of 18 months, returning a few days before the election. They had paid their poll taxes for the previous year, but did so only because the collector would not accept their property tax without· payment of the poll tax. She voted in the election, and was still there at the time of the trial of this case in the following month. Her husband does not appear to have voted. In the meantime they made some unsuccessful efforts to sell their home, of which they had not repossessed themselves. They were living in a rented house. Mrs. Morse and her husband testified that during all of their absence they had an intention to return to and maintain their home in the county. We think the facts stated were sufficient to overcome Mrs. Morse's claim of intention, or at least they raised a clear issue, which the court resolved against appellant in a finding which we do not feel warranted in disturbing. Appellant's fourth proposition is accordingly overruled. In this connection we will advert to appellee's second cross-proposition, which relates to the same question.

Harold D. Rice and wife voted for appellant, and the trial court so counted· their ballots. Appellee challenges this ruling, insisting that the evidence showed the Rices had· not been residents of the state for 12 months next preceding the election, which was held on November 4, 1924. It appears that the Rices moved to Hidalgo county in 1919, and remained there until April, 1923, when they sold out all their property, except a little personal property, went to Pennsylvania, and remained there until they came to Raymondville on November 14, 1923, which was less than one year prior to the election. It appears that in leaving Hidalgo Rice went by Raymondville, and left his unsold personal belongings with his mother,

who had recently located there. Rice and his wife than drove across country to Philadelphia, Mrs. Rice's former home, where her people still lived. Mrs. Rice went up there with the intention of remaining there, and without any intention of returning to Texas. Her husband went along with the intention of remaining with his wife, as long as she stayed, expecting her to change her mind and agree to return to Texas. "The situation was," he testified, "that whatever length of time she wanted to stay I was going to stay with her. My intention was to stay there long enough to satisfy herself and convince herself, and I didn't figure it would be over 6 months at the outside; in fact, I knew it wouldn't. When she did become convinced, we both made up our minds to come on back and stay here." We think this vague, indefinite intention in the mind of the husband, which was not even shared by the wife, was insufficient to constitute the character of residence contemplated by the statute. By abandoning Hildalgo county with the intention never to return there, and by at once leaving the state with no definite intention to return, they ceased to be residents of the state. The fact that they subsequently formed an intention to reside in Texas, and returned to the state for that purpose, constituted them such residents, beginning with the date of their actual return and settlement for that purpose, which was less than 12 months before the election, in which case, under the statute, they could not legally vote. The same reasoning upon which the court excluded the ballot of Mrs. Morse applies to the ballots of the Rices; the fact in support thereof being stronger in the case of the latter. This question is raised in appellee's second cross-proposition of law, which is sustained, and these two votes will be deducted from appellant's total.

[10] While considering the question of residence we will dispose of appellee's first cross-proposition, challenging the action of the court in excluding the ballot cast by Mrs. Wesley Ludlum for appellee. The evidence showed that about two years before the election Mrs. Ludlum and her husband, theretofore residents of Raymondville, left that place and moved to Florida, where it seems they had acquired and still own their only home. They owned no home in Raymondville. After spending 18 months in Florida, Mrs. Ludlum returned to Raymondville, but her husband stayed on in Florida. She voted at this election, and was still in Raymondville when this cause was tried a few weeks later. It is significant, however, that she did not testify. The evidence conflicted as to what her expressed intentions were, as to whether she was back in Raymondville only temporarily, or to remain there. But the preponderance of that evidence was that she did not regard Raymondville as her home, and, her

husband having refused to rejoin her there, she expected to rejoin him in Florida. The trial court heard several witnesses upon this issue, and, we think, correctly resolved it against appellee, whose cross-proposition thereon is overruled.

J. E. Miller voted for appellant, and the vote was counted below as cast. In his second proposition appellee challenges the court's action, contending that through absence in another state the voter had not preserved his status as a resident. We quote Miller's testimony, which comprises the statement under this cross-proposition, to which appellant has made no reply:

"I live about three and a half miles south of Lyford. I am a married man. My wife is at present in St. Louis, taking care of her mother and sick brother. She left here about the 14th of last September a year ago (1923). Prior to that time she lived with me at Lyford. Her mother and brother were both sick, and she had to go there and take care of them. I went to St. Louis the 5th day of this last January (1924), and stayed up there till the 28th of July. I went up there merely for a visit and a rest. I rented my place to W. H. Dodd just before Christmas (1923) for one year. That was the agreement—he was to have it for one year. I came back, and Mr. Dodd turned it back to me some time in September. While I was in St. Louis, I worked at the carpenter's trade and mechanic. I stayed at my wife's mother's home; my wife was making that her home at the time. I suppose she called it home all the time. When I left here January a year ago I stored my personal belongings and household goods in my barn; didn't sell anything. I sold some cows and farm tools to the man I rented from, and when I came back I bought them back."

From this evidence it appears that Mrs. Miller had been absent from the state during the full 14 months next preceding the election, and was still absent at the time this cause was tried several weeks later. The inference from her husband's testimony was that she looked upon her mother's home in St. Louis as her home, and called it her home "all the time." It does not appear that she has any intention of returning to Texas to reside, nor is she divorced or separated, in the offensive sense, from her husband, who had spent 7 of the 14 months visiting her there. Her husband expressed no intention as to permanent residence. His strongest expression in that regard was that he went to St. Louis January 5th, and remained until July 28th, "merely for a visit and a rest," although he worked at his trade throughout the period of the "rest." So far as the record shows to the contrary, Mrs. Miller may never return to Texas, and her husband may have no intention of making the state his permanent home. We do not think the record justified the trial court's holding that Miller was a resident of the state for 12 months next preceding the day of the elec-

tion. He was therefore not a legal voter, and his vote should be deducted from appellant's total.

[11] The trial court found that J. H. Ransom was a resident of Cameron county on January 1, 1923. Ransom did not pay his 1923 poll tax to that county, however, but paid it to Willacy county before February 1, 1924, having become a permanent resident thereof in September, 1923. He voted for appellant, for whom his ballot was counted in the returns, but excluded by the trial court on the finding that he was a resident of Cameron county on January 1, 1923, and did not pay a poll tax to that county for that year, thus placing him in the category of Alcantar and four others discussed above under appellant's second proposition. Appellant challenges this action of the court, contending that the evidence shows Ransom was not a resident of Cameron county on January 1, 1923, but was a transient person, not liable to Cameron county for the tax for that year, and having seasonably paid the tax to Willacy, of which he had unquestionably been a resident more than a year next preceding the election, was entitled to vote therein. So the validity of his ballot depends on the question of fact as to whether he was a transient person or a resident of Cameron county on January 1, 1923. The facts as to this voter are undisputed, and are clearly disclosed by his own testimony. He was 49 years of age, and unmarried. For 12 years he had been a member of a bridge gang on a railroad traversing that section of the state. During all that time he had eaten and slept in that car, and had his washing done wherever it stopped long enough to permit the service. The car was never stationed in any particular county, but was constantly "moving about from place to place in the state of Texas," keeping the railroad's bridges in repair. It was his only home during the 12 years. His father had lived in Cameron county, and whenever the son visited there he stayed at his father's or his sister's and "considered" that his home. But his father had been dead three years and it is reasonably inferred from Ransom's testimony that he had not even visited the old home during that period. His case does not disclose a single element of residence in Cameron county, except the voter's bare conclusion, expressed in his testimony, that he "considered" that county his home, and that it was his home. But this conclusion was refuted, not only by facts in detail affirmatively showing to the contrary, but by his further conclusion, frequently expressed in his testimony, that he was a "transient," and had had no home except on the bridge car. During the 12 years he was on the bridge gang he had paid no poll tax nor voted in any county. In September, 1923, however, he quit the bridge gang, settled at Sebastian, in Willacy county, where he ac-

cepted and is still engaged in local employment, seasonably paid that year's poll tax to that county, and voted at the ensuing election therein. In this state of facts the voter was not liable to Cameron or any other county for the 1923 county tax, and his payment of the state tax to Willacy county entitled him to vote in the election there. His ballot was cast for appellant, and the court erred in not so counting it. We sustain appellant's third proposition.

[12] A. N. Davis and his wife voted for appellant, but their votes were excluded by the court below on the finding of the trial court that they abandoned their residence in Willacy county. The evidence showed that in April, 1924, the Davises had acquired and moved into a homestead at Raymondville, the county seat, to be paid for in monthly installments. They had been married 13 years, had a family of five children, and Mrs. Davis was in very poor health. Her husband is a band master and a Baptist preacher, and at the time of the election was working in a lumber yard in Cameron county, but expects, as soon as his wife's health permits, to enter the evangelistic field. He is a poor man, dependent upon whatever work he can get, wherever he can get it. This condition has kept him away from Willacy county most of the time since he purchased the home there, and, unless conditions change, will probably keep him away much of the time in the future. He declares he does not intend to give up his home, hopes to keep up his payments on it, to make it his permanent home, where his wife and children may stay, and where he also may stay as much of the time as the uncertainties of his callings may allow. They originally moved to Willacy county from Abilene, where they owned a home, which they sold on leaving there. They own no other home than that in Raymondville, do not expect to sell that one, but hope and intend to live in it, even though they must at times rent it out and live elsewhere, according to the exigencies of their rather precarious existence. We think the court erred in holding that this family had abandoned their home and their residence in Raymondville. Every family, no matter how unhappily situated, no matter how cruelly pursued by misfortune or penalized by the adversities of thriftlessness, improvidence, or other causes, should not be denied the privilege of making and calling some place their home merely because their poverty or other necessities may oblige them, from time to time, to temporarily abide elsewhere. If it is their own, if they own no other, if they look upon or towards it as their home, if they intend to keep and maintain it as such in spite of vicissitudes which may sometimes interrupt their use of it, and no matter how humble it is in its appointments, it is not for the courts to deprive it of that character and them of their franchise through strict construction of our election laws. We hold that the ballots of these voters should be counted as cast.

[13] E. E. Campbell and his wife moved to Raymondville on January 5, 1924; rented and moved into a dwelling house, which they continued to occupy until August 8th, when the owner took possession of it for his own uses. Campbell diligently sought to rent another house for his family, but could find none. His wife was far advanced in pregnancy, and because of her condition they quite naturally decided they should not go into a hotel or boarding house to live. In this situation Mrs. Campbell, with her husband's approval, decided and did go to her mother, in an adjoining county, and remained there until her child was born in the following December. Campbell remained in Raymondville, where he had a position, although whenever he found opportunity he went over and spent the night with his wife at her mother's. He continued at his work in Raymondville until two or three days before the election, when he was discharged. He set about to get other employment, and remained there with that object in view until several weeks after the election, when he accepted a position in another county, to which he then removed. He and his wife voted in the July primary in Willacy county; they kept their furniture in storage there, after they were obliged to give up their house. Campbell actually resided there with the intention of maintaining his residence there from January 5th until after the election was held. The only incident raising any question of residence was the absence of Mrs. Campbell with her mother in expectation of her first-born child, and in pursuing that course she but yielded to the natural instinct of every young mother to return for the solemn event to the care and ministration of her own mother. The state of Texas does not disfranchise its citizens in such cases as this. No matter how families may be situated, they are not held to have abandoned their residence in a given community merely because the husband or wife or both temporarily absent themselves on account of their own health, or that of their children, or to educate their children, or to serve their government, or because their trade or business or profession takes them elsewhere for varying periods of time. Campbell's ballot should have been counted for appellant, for whom it was cast. This is not an issue on which there is a conflict of evidence, nor does its disposition depend upon the preponderance of the evidence, as appellee contends. The decision depends upon the application of the law to facts which are clear and undisputed. We have very carefully refrained in this case from deciding any matter upon our conclusion as to the preponderance of the evi-

dence, nor do we intend to disturb the trial court's finding upon any issue where the evidence is in conflict upon a material element of that issue.

[14] Manuel Seis voted for appellant, but the trial court excluded his ballot on the ground that the voter was an alien. Both parents of Seis were born in Mexico, and he testified his mother told him he also was born in that republic. His father died when he was two years of age, and the son testified that, if his father ever became naturalized, the witness "never heard of it." The status of the voter was precisely the same as that of Jose Alcala in the case of Huff v. Duffield, 251 S. W. 298, the record in which we have again examined, and in which this court held Alcala to be disqualified. We approve the action of the trial court as to Seis, and overrule appellant's tenth proposition.

[15] Two ballots numbered 128 were cast in precinct No. 2. The tally list shows Mrs. Julia Oberg's number to be 127, and her husband's number to be 128. No ballot numbered 127 was cast, however. Oberg testified that his wife immediately preceded him in voting, that she voted, and he recognized one of the ballots numbered 128 to be the ballot cast by him. Mrs. Oberg did not testify, being at home and ill, and Oberg failed to identify the alternate ballot 128 as having been marked or voted by his wife. So we have two ballots numbered in duplicate, one of them being fully identified by the voter casting it. The other stands unidentified, unless-identification may be inferred from the facts that Mrs. Oberg's number on the tally list was 127; that no ballot bearing that number was cast; and that she preceded her husband into the polling place, cast her ballot just before he cast his, which was numbered 128. This combination of circumstances strongly indicates that through the carelessness of the numbering official her ballot was given the number 128, when its correct number was 127. Under the law each ballot must be given the number corresponding to the voter's number on the poll list so that it may be certainly identified; that fraud may be prevented, and that no voter may cast more than one effective ballot. Where two ballots bear identical numbers, the fact becomes obvious that the voter bearing that number on the tally list has cast two ballots, or that a ballot has been cast without having been numbered as required by law. If the voter bearing that number satisfactorily identifies one of the two as the ballot cast by him, such ballot will be counted as cast, but the identification of that ballot automatically discredits its alternate, at least in the absence of a full and satisfactory identification and explanation. We think such identification and explanation was supplied in this instance, and that both ballots 128 should have been counted for appellant.

For the same reason the duplicate ballots cast in precinct No. 4 for appellant were properly counted by the trial court as cast. This holding relates to appellee's fifth cross-proposition, which is overruled.

We appear to have disposed of all of appellant's propositions of law, as well as appellee's propositions based upon his cross-assignments of error, except the third and fourth, and, while we find upon checking up the relative status of the total votes at this juncture—and not before—that it is not necessary to decide those two propositions, we have gone somewhat into them, and are inclined to overrule them.

We have not disturbed the trial court's disposition of the ballots cast by Mrs. McDowell, H. C. Smith, Mrs. Morse, J. B. Pollock, Mrs. Ludlum, W. L. Skipper and wife, Manuel Seis, and Charles Humber. The trial court found that appellee received 262 votes and appellant 256 votes, or a majority of 6 for the former. We have excluded none of the ballots counted below for appellee, but of the ballots counted for appellant we have excluded those of Mr. and Mrs. Rice and of J. E. Miller, 3 votes, which served to reduce appellant's total to 253. We have restored no votes which were cast for appellee and excluded below, but of those cast for appellant and excluded below we have counted those of J. H. Ransom, Mr. and Mrs. Davis, E. E. Campbell, and Mrs. Oberg, 5 votes, which raises appellant's total from 253 to 258 votes, against appellee's total of 262. The result, as will be seen, is a majority of four votes for appellee. That is our judgment.

We have not been unmindful of the grave responsibility resting upon this court in the decision of the case, which responsibility has of course been much enhanced by the extreme closeness of the race. We have given the most serious and painstaking consideration to each issue presented, and have endeavored to work it out and finally decide it, wholly without reference to, and even without knowledge of, its relation to or effect upon the ultimate totals.

The judgment is affirmed.

### On Motion for Rehearing.

In his motion for rehearing appellant has called to our attention additional evidence which was not considered in the original disposition of the case. This evidence concerns the issue of fact as to whether or not Harold D. Rice and wife and J. E. Miller were residents of Willacy county for the purpose of voting.

The trial court found that these voters were such residents, and counted their ballots for appellant, for whom they were cast; but in the original disposition of the case we held that the trial court erred in these findings.

We have concluded in considering the additional evidence that we are without authority to overrule the trial court's findings, and that the ballots of the three voters mentioned should be sustained as cast. This conclusion results in adding 3 votes to the total of 258 credited to appellant in the original disposition, which increases his total to 261 votes as against 262 for appellee. This holding, then, does not affect the result declared in the trial court, or our original disposition.

We have very carefully considered the other grounds of error set out in appellant's motion for rehearing, and overrule them.

Motion overruled.