## McCormick *v.* Wall.

[No. 25,530.   Filed November 1, 1929.   Rehearing denied January 10, 1930.]

*Barce & Barce* and *Fraser & Isham,* for appellant.
*Berry & Nolin* and *Mehaffey & Haupt,* for appellee.

MYERS, J.—This is a township trustee election contest proceeding commenced before the board of county commissioners of Benton County. At the November, 1926, township trustee election for Hickory Grove Township in Benton County, appellant, contestor, and appellee, contestee, were the only persons who received votes for that office. The result of the vote certified by the board of canvassers gave the contestor 243 and the contestee 247 votes respectively. A trial was had before the board of county commissioners upon pleadings charging that 15 illegal votes were cast for the contestee and that contestor received five illegal votes. From the judgment of the board of commissioners, an appeal was taken to the Benton Circuit Court, and, on change of venue, the cause was again tried in the Warren Circuit Court where a general finding in favor of appellee was made and judgment accordingly. From that judgment, appellant prosecuted this appeal assigning as error the

action of the court in overruling his motion for a new trial. The causes for a new trial relied on by appellant are that the decision of the court is not sustained by sufficient evidence, that it is contrary to law, and six alleged errors in the admission and rejection of evidence.

One cannot read the record in this case without being convinced that the controlling issue in the election of a township trustee in the instant case was Klan and Anti-Klan. At the trial, the court excluded evidence which tended to show that the contestee was a member of the Ku Klux Klan. The theory upon which this evidence was claimed to be admissible was that the alleged illegal voters were Klansmen, an organization shown to be radically opposed to a Catholic holding public office and to the employment of Catholic teachers in the public schools. Appellant, a candidate to succeed himself, was a Catholic and had employed 14 teachers in his township, five of whom were Catholics. Under this state of the record, contestor, appellant here, insisted that he was entitled to have the evidence tending to prove that contestee was a Klansman and the inference that he received the Klan vote.

Each of the parties to this proceeding charged that his opponent received illegal votes. Each thereby tendered an affirmative issue and assumed the burden of proving it. The mere fact that illegal votes were cast is unavailing to the party so claiming, unless it is shown, either by direct or circumstantial evidence, that his opponent received them. 20 C. J. 247, §341.

The apparent prominence of the Klan issue between these two contesting candidates made the inquiry as to contestee's connection with the Klan entirely proper and the exclusion of such evidence tendered by the contestor under the circumstances would be regarded as harmful error were it not for the fact that the record discloses that, during the hearing of evidence,

the trial judge announced that he would change his ruling and permit contestor to introduce evidence tending to show that appellee was a Klansman. No effort, it seems, was made on the part of appellant to supply that evidence, nor any excuse or explanation offered to the court why he could not then furnish the previously excluded evidence, or a showing that the delayed change in the court's ruling was harmful to him. Hence, we hold that the error, if any, made by the court in excluding the evidence to which we have referred was cured by the court's offer to admit it.

There was some testimony admitted over objection tending to show that one might have a voting residence in a state, county or township, and at the same time have his domicile or actual residence in some other jurisdiction. Such a situation would certainly be a novel one. True, mere presence in a place does not necessarily import domicile or residence, which, to a large extent, must be governed by the relative circumstances, as for instance, a soldier in actual service, a seaman, an employee of the government or state, and other instances might be suggested where the place of their presence would not control, but, in each of these instances, the word "sojourning" would more accurately designate their status relative to place.

Our state Constitution, Art. 2, §2, requires of a voter certain qualifications, and, in that connection, uses the word "resided," which, according to definitions furnished by lexicographers (Webster and Standard), means "to take up one's abode"; "to dwell permanently or for a considerable time"; "to have a settled abode for a time." However, §2, *supra*, fixes the time of residence in the state six months, in the township 60 days, and in the ward or precinct 30 days immediately preceding the election.

The evidence admitted over objection with reference

to the residence of certain persons who voted was made more noticeably subject to criticism by the form of the questions to the witnesses. The distinction in the attorney's mind between a voting residence and actual residence was not at all clear to the witnesses. The answers of the witnesses, however, were sufficiently explicit to enable the court, in most cases, to determine the question of residence with reasonable certainty. The law is well settled that the trial court's decision cannot be disturbed by this court if, from our examination of the evidence and giving the trial court the benefit of the doubt, we find legal evidence to sustain the essential elements required to support its finding. *Hacker* v. *Conrad* (1892), 131 Ind. 444, 31 N. E. 190; *Continental Nat. Bank* v. *Discount, etc., State Bank* (1927), 199 Ind. 290, 157 N. E. 433.

On the part of contestor, the evidence narrowed down to seven contested votes, and on the part of contestee only two votes can be said to be in question. At the time of the election, it appears without dispute that four of the voters whose votes were contested by contestor were actually domiciled in the State of Illinois, two of whom, husband and wife, lived together in a furnished home close to the state line, the husband being engaged in farming along with his father and brother, each of whom resided in Hickory Grove Township. The land, 440 acres, was situated part in Indiana and part in Illinois, and by these parties jointly cultivated. It appears that the son who lived in Illinois had a room at his father's house furnished by himself and where he kept his best clothing and, with his family, actually resided there during part of each year, and referred to it as his home, and from which location he had always voted. This evidence, together with other circumstances unnecessary for us to set forth, justified the court in finding that these two votes were legally cast in Hickory Grove Township.

The other two Illinois votes, husband and wife, at the time of the election, were actually residing together at Kankakee, Illinois. They first removed all of their effects from Ambia in Hickory Grove Township to another township in Benton County on February 8, 1926, and, from which place, on September 3, 1926, they moved all of their belongings to Kankakee. There was some evidence tending to show statements made by the husband, during the interim between February and November, that he intended to return to Ambia to vote at the fall election. There was evidence tending to show that he was a "Kluxer," but he testified at the trial of this case that he voted for the contestor. His wife said that she voted for the contestee. From all of the circumstances adduced at the trial with reference to these two votes, the trial court was without evidence justifying a finding that they were legal voters in Hickory Grove Township. To which candidate the trial court gave the husband's vote we have no means of knowing, for, under the evidence, this vote might have been credited to either one.

From the undisputed evidence it appears that two other contested voters, husband and wife, on March 11, 1926, moved all of their property from Hickory Grove Township, Benton County, to Warren County, where they continued to reside and were residing on the day of the election in November, 1926; that they were engaged in farming upon their own account and testified, in effect, that they did not know whether they intended to return to Ambia or Hickory Grove Township. Permits were granted authorizing them to send their children to school at Ambia. From other circumstances detailed by these persons, it seems perfectly clear that they were not entitled to vote at the November, 1926, election in Hickory Grove Township.

Another, and the last vote in dispute by contestor,

was that of a lady who for some years had lived and kept house in Decatur, Illinois. She had been separated from her husband five or six years, but until March, 1926, she had unquestionably maintained her residence at Decatur. In March, 1926, she moved all of her household goods from Decatur, leaving part with one sister and part with another, both married and living in Hickory Grove Township. From the time she moved her furniture from Decatur, she did not at that place again establish any definite place of abode. She was a nurse, and each year for several years had spent some time, a month or two, with her sisters in Indiana. In August following the time of moving her furniture, she came to Indiana and remained with her two sisters continuously until in December following the November election, when she returned to Decatur, but left her household furniture with her two sisters. Whether she came with her goods to Indiana, and if so, how long she remained here does not satisfactorily appear from the evidence. How this vote was treated by the trial court, we have no way of determining.

Referring to the votes questioned by appellee, one of these was cast by a person who might well have been regarded as a resident of Washington County. He gave no evidence in this case, and for which candidate he voted there is but a slight inference, but aside from these votes the conclusion most favorable to the findings of the trial court, which we are compelled to recognize, may be summed up as follows: Three illegal votes cast for appellee, which are all of the votes we would be authorized to deduct, leaving a net result of 244 votes for appellee and 243 for appellant.

Judgment affirmed.