HENRY v. OKLAHOMA CITY et al.

No. 30056. Nov. 26, 1940.

Rehearing Denied Dec. 17, 1940.

*108 P. 2d 148.*

Edward Kirby Brook, of Oklahoma City, for plaintiff in error.

A. L. Jeffrey and Leon Shipp, both of Oklahoma City, for defendants in error.

BAYLESS, C. J. February 20, 1940, an election was held in Oklahoma City for the purpose of deciding whether said city should issue $6,911,000 negotiable coupon bonds for the purpose of providing funds for proposed water supply improvements. Admittedly the election was held in pursuance of the authority of article 10, secs. 26 and 27, Constitution of Oklahoma, and is wholly governed by said constitutional provisions, as aided and construed by applicable laws of the State Legislature and decisions of this court.

The ballots cast at this election were counted, certified, canvassed, and the result thereof declared: for the proposition 7,578 votes; against the proposition 7,182 votes. Calculation shows a majority for the proposition of 396.

March 4, 1940, an action was filed by J. J. Henry, "a registered property taxpaying voter of and in said city," against said city as a municipal entity, and the mayor and council, and its city manager, whereby it was sought to have said election declared "illegal, void and of no effect; that the said defendants * * * be permanently enjoined from issuing, selling, or offering to sell, hypothecating or otherwise disposing of said bonds," and other proper relief. There were allegations of various acts on the part of the city and those officials charged by law with the duty of the holding of the election whereby voters of a number sufficient to change the result of the election, not qualified by law, were permitted to vote, by reason of which the election was alleged to be illegal and void. The defense pleaded was the general denial. Trial of the matter began on March 19, 1940, and was concluded on March 25, 1940, when the trial court sustained the defendants' demurrer to the plaintiff's evidence.

Fifteen assignments of error are made, but they are arranged in three groups for the purposes of presentation, viz.:

## Group One.

(1) Those relating to the errors of court in overruling and denying on March 18th, 1940, the motion of the plaintiff in error for an order directing the secretary of the county election board of Oklahoma county, Oklahoma, to produce for inspection and investigation the affidavits in form and tenor and on forms set out in said motion and made a part of plaintiff's petition herein as exhibit "B" thereof and accepted by the various election precinct boards of said City of Oklahoma City, Oklahoma, at the water bond election in said city on February 20, 1940, in lieu of statutory and constitutional requirements as a test of qualification of the several respective individuals offering themselves as qualified property taxpaying voters in said election, to which action of the court in denying said motion, the plaintiff in error excepted at the time, namely, assignments of error numbers 2, 9, 12 and 13.

## Group Two.

(2) Those relating to the errors of the court in denying plaintiff's motion for a new trial, and other assignments of error, namely, 1, 3, 4, 5, 6, 7, 8, and 10.

### Group Three.

(3) Those assignments of error relating to qualified property taxpaying voters, and other assignments, namely, 11, 14 and 15.

Defendants answer these propositions and make an argument touching upon the constitutionality of a section of statute law relied upon by plaintiff.

Plaintiff presents first the errors included in group 3, although when all of the argument thereunder is considered it goes mostly to one point: Who is a qualified voter within the purview of the Constitution, and how is this qualification to vote to be evidenced?

Article 10, sec. 27, Constitution of Oklahoma, reads:

"Any incorporated city or town in this state may, by a majority of the qualified property taxpaying voters of such city or town, voting at an election to be held for that purpose, be allowed to become indebted in a larger amount than that specified in section twenty-six, for the purpose of purchasing or constructing public utilities, or for repairing the same, to be owned exclusively by such city; Provided, that any such city or town incurring any such indebtedness requiring the assent of the voters as aforesaid, shall have the power to provide for, and, before or at the time of incurring such indebtedness, shall provide for the collection of an annual tax in addition to the other taxes provided for by this Constitution, sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof within twenty-five years from the time of contracting the same."

Plaintiff asserts that the Legislature apparently deemed the term "qualified property taxpaying voters" indefinite, and therefore ambiguous and unworkable, and to remedy the defect enacted chapter 169, S. L. 1913, cited as section 6042, O. S. 1931, 11 O. S. A. § 65; reading:

"A qualified property taxpaying voter of any incorporated city or town as used in section 27, article 10, of the Constitution of the state of Oklahoma is defined to be any qualified elector under the Constitution and laws of the state of Oklahoma who has actually paid taxes on property within such city or town and who has a legal tax receipt therefor dated within twelve months prior to such election."

Using the language of this section and giving it a literal meaning, the plaintiff asserts that the only evidence of eligibility to vote in the election under consideration is a tax receipt for taxes paid within twelve months of the election. In other words, plaintiff insists that a prospective voter must actually possess a tax receipt and must exhibit it to the election officials as a prerequisite to vote. In support thereof he cites the following: Wright v. State Bd. (S.C.) 57 S. E. 536, and other cases in South Carolina based thereon, and Rich v. Town, 134 U. S. 640, 33 L. Ed. 1074, cited by plaintiff.

Defendants argue that the interpretation of the statute contended for is too narrow and inflexible, and would constitute a restriction or abridgment of an otherwise constitutional right to vote.

We think an interpretation of the statute which would require a voter to physically possess "a legal tax receipt * * * dated within twelve months prior to the election," and to present such receipt to the election officials as proof of his eligibility to vote is unjustified. In considering the question of fraud it is to be observed that the record contains several written opinions given by the Attorney General to the officials in Oklahoma who conduct elections wherein the statute, supra, has been given an interpretation different to that contended for by plaintiff. In all of such opinions it is recognized that qualified voters might be disfranchised if the statute were enforced as plaintiff insists it should be.

In the record there appears the testimony of several classes of voters who did not have tax receipts within the meaning plaintiff asserts. In some cases one of the spouses held joint property in his or her name; in other cases, although the property was held jointly, one had paid the taxes with joint funds, but held the tax receipt in one name; in other cases the voters had paid taxes on their

property through some agency that held the receipts, and in other cases the money for the taxes had been paid into the county treasurer, but owing to the press of business no receipt had been issued.

In all of these cases the trial judge ruled that such voters were fully qualified to vote within the meaning of the statute, and we think rightfully so. Those voters had receipts within the meaning of the statute, and it would be an unreasonable interpretation of the statute to hold otherwise.

We do not believe the case of State v. Williams (S. C.) 154 S. E. 164, cited by plaintiff, sustains his contention. It is said in the opinion: "* * * It would be a question for the managers of the election to determine what proof would be required of the prospective voter of the payment of the taxes." Just so in this case. The Legislature may enact legislation to aid the election officials to decide who is a "qualified taxpaying voter," but in the final analysis, it is the election officials who must decide what proof convinces them of the fact, and their decision should be exercised reasonably so as not to disfranchise a voter.

Plaintiff next says that the court should have ruled that:

"A qualified taxpaying voter at the said election and the only persons entitled to vote at the said election were qualified electors of said city of Oklahoma City, Oklahoma, under the Constitution and laws of the state of Oklahoma, who owned real or personal property situated in Oklahoma City, Oklahoma, and who had a tax receipt therefor showing payment of taxes thereon, dated within twelve months prior to the said election. This assignment of error is the one around which the controversy now before the court revolves. In other words, can a voter at a bond election vote in said election without having a tax receipt as required by the Constitution and laws of this state?"

Further, plaintiff observes that what this court may say with respect to group 3, already discussed, will dispose of this contention. We agree. We have rejected the narrow and inflexible interpretation sought to be placed upon section 6042, supra.

This view of the case is not taken in indifference to the fact that a very perplexing problem may face the election officials at the elections held by authority of the constitutional provisions cited. It is obvious that the intent and purpose of the Constitution of Oklahoma is to render ineligible to vote on the question of bonded debts by municipalities those qualified voters who do not pay taxes on real or personal property. The election officials must determine what electors presenting themselves to vote are wholly qualified. 18 C. J. 227, § 72, and cases cited.

What we have said leads us to a consideration of the remaining group of assignments, that involves the use of the affidavit as evidence of the elector's eligibility to vote, and the discretion of the trial judge in refusing to permit access to the affidavits in order that their veracity might be checked.

We are of the opinion that until the Legislature may otherwise provide, the election officials are justified in accepting from prospective electors affidavits of their eligibility to vote. The Attorney General has so advised election officials for many years, and we think it may be held to amount to an administrative construction of the law on the subject.

It is urged that the form of affidavit used in this election is fatally defective, and is misleading. This form reads:

"————, of lawful age, being first duly sworn upon oath, states: That he-she is a qualified property taxpaying voter in Oklahoma County, Oklahoma, as provided by law, and that this affidavit is made for the purpose of obtaining a ballot to vote upon the bond issues submitted this date."

It can be seen that the elector using the form of affidavit furnished only swears that he is "a qualified property taxpaying voter in Oklahoma county" and does not restrict his property taxpaying to

Oklahoma City. We are of the opinion from the evidence that it was known that this form was so worded before it was used, and it was not regarded as a material defect. It is also proper to state that along with this form of affidavit was sent a copy of the opinion of the city attorney. In this opinion of the city attorney the qualifications were carefully detailed in order that the election officials might be properly advised, and this opinion clearly stated that only qualified tax-paying voters of Oklahoma City were eligible to vote.

Prior to the trial, plaintiff applied by motion to the trial judge for an order directing the ballot boxes to be opened in order that inspection might be made to determine how many affidavits were used, by whom used, and to investigate the eligibility of the affiants to vote. This was denied by the trial judge, and under authority of Logan v. Young, 121 Okla. 203, 249 P. 369, we are of the opinion that no abuse of discretion was shown. In that case a defeated candidate filed an election contest action wherein he made numerous charges of mistakes, irregularities, and misconduct whereby he was wrongfully defeated. At the trial of the case the plaintiff produced only such testimony as established his eligibility for the office, the retention of the ballots in an undisturbed condition by the county election board, and the issuance of the certificate of election to his opponent. Without further proof he then applied to have the ballot boxes opened, to which his opponent objected that there had been no preliminary proof in support of the allegations of error, mistake, or fraud sufficient to overcome the legal presumption in favor of the returns of said election. The trial court refused to open the ballot boxes, and on appeal we had this to say respecting that rule:

"While, in an election contest, the ballots were the best evidence of the number of votes received by any candidate, a party who in his complaint charged every election officer in the county with fraud and malconduct could not have the ballot boxes counted without first offering proof of the fraud and misconduct alleged aliunde the ballot boxes. * * *"

"In an election contest, the contestant is not entitled to have the ballot boxes opened and the ballots counted without preliminary proof to sustain his charge of fraud and malconduct. * * *"

The plaintiff had access to the names of the various election officials, and could have subpoenaed them to testify how the election was conducted. If these election officials had been used as witnesses, information could have been elicited from them as to how the election was actually conducted. They could have testified as to whether the affidavits were used as found in the boxes or whether they were corrected. They could have testified whether the affidavits were the only means used to ascertain whether a prospective voter was eligible. Aside from proving that in some precincts all of the affidavits were used, and more prepared of the same form and sent to be used, no other proof was made to support the allegations of wholesale fraud and misconduct on the part of the officials, and some proof of this might have been made, it seems to us, without resort to the contents of the ballot boxes, if such were the facts. We cannot presume that the election officials relied upon the affidavits as the only means of establishing eligibility to vote. The presumption is they properly performed their duties.

However, after the trial had progressed several days, plaintiff filed an application reading:

"Comes now the plaintiff and moves the court to adjourn the hearing of this cause, and to postpone further hearing therein for a reasonable time, and as grounds for said motion says:

"1. That this cause was filed in this court on the 4th day of March, 1940; that no temporary relief was requested, and that defendants were, by summons, given until April 3rd, 1940, in which to answer; that thereafter, plaintiff, through his attorneys, agreed with the defendants, through their attorneys, that upon the filing of a demurrer by defendants,

plaintiff would not demand the usual time for hearing thereon, but would consent to an immediate hearing on said demurrer; that upon said agreement, said defendants filed their demurrers, which were, under said agreement, heard by the court on the day that they were filed; that upon the overruling of said demurrers said defendants filed their answers and requested this plaintiff to agree with defendants for as early a date for trial of the issues as possible; that plaintiff did so agree, and said cause was, under the said agreement, set for trial on March 19, 1940, exactly fifteen days after the cause was filed in this court.

"That plaintiff waived his time as hereinbefore alleged, and consented to the early trial of said cause because he did not want to delay the hearing more than was necessary on a matter of public importance, and because he believed that within the said two weeks he could prepare to properly gather his evidence and be prepared to properly present his case.

"2.    Plaintiff further said that as soon as he could do so, and within a few days after the case was filed, he began to check the precinct registers kept by the precinct registrars, of the names of the persons voting at said election, in the effort to determine, as nearly as possible, the qualifications, under the law, of such persons to vote at the said election held in Oklahoma City on February 20, 1940. That in such check he used from four to eight people.

"That after procuring the names of the voters in several precincts as aforesaid, he began the task of checking said names against the personal property and real estate tax rolls in the office of the county treasurer of Oklahoma county, to determine, as nearly as possible, which of said voters had and which had not paid taxes on real or personal property in Oklahoma City, Oklahoma, owed by them and had a tax receipt therefor dated within twelve months of the said election.

"Plaintiff found, when he began the said check, that the said county treasurer keeps and maintains an alphabetical list of personal property taxpayers in Oklahoma county, and that by checking the name of the voter against such alphabetical lists for each of the several respective years last past (there being separate alphabetical personal property lists for each year) that he could get a fairly accurate check upon those who had paid personal property taxes within the twelve months prior to said election; but plaintiff discovered that there was no alphabetical list of real property taxpayers, and that the only method of checking and ascertaining the payment of taxes on real estate in Oklahoma City was from a description of the property by lot and block numbers, and not from the name of the voter.

"That plaintiff put four checkers to work in the county clerk's office, to ascertain, as nearly as possible the description of any real estate owned by the voters, and in the county treasurer's office to ascertain if the voter had paid taxes on that real estate within twelve months prior to said election.

"That as soon as plaintiff's checkers began to check the said records, four or more persons were by the defendants put to work on the same records for the purpose of making a similar check.

"That the said records in the county clerk's office and in the county treasurer's office are and have been in constant use by the clerks and deputies in the offices of said county clerk and county treasurer; that with such use of said books by the officials, and the use of said records and books by the checkers put to work by the defendants, it has been impossible for the plaintiff to procure any accurate list of voters that seemed to be disqualified, or to have access to said records for making a proper check of said matters.

"That plaintiff inquired of the county treasurer if it would be possible to use to advantage more than four checkers on the books and records in his office, and the county treasurer informed plaintiff that additional checkers would not be of any advantage because of the use that it was necessary to make of the books by the clerks and deputies in his office, and because of the use that the city's checkers desired to make of the said books.

"Plaintiff says that because of this condition he did not have any accurate check for the aforesaid information at the time this hearing commenced on March 19, 1940. Nevertheless, plaintiff did not ask for a postponement of the case, and announced ready for trial and proceeded to trial without objection, hoping that the

checkers would be able to make a sufficient check from day to day, as the trial proceeded.

"Plaintiff further says that his checkers have not been able to use said books for a sufficient time from day to day to procure such information from said records; the result has been that plaintiff has been compelled to subpoena voters at said election, indiscriminately, and without any information as to whether they were qualified taxpaying voters under the laws of the state regulating such election. .

"The result is that many voters have been subpoenaed at the instance and expense of plaintiff who would not have been subpoenaed if plaintiff had had reasonable opportunity to make a reasonably accurate check of the records for the above-mentioned information; that if plaintiff is compelled to continue with his testimony at this time, he will be compelled to continue to subpoena, indiscriminately, the persons who voted at the said election; that the sheriff's fees, witness fees and other expenses incident to the calling of such unnecessary witnesses is prohibitive; that it is an unnecessary burden upon the time of persons who are thus needlessly called as witnesses; that it causes an unwarranted and unnecessary use of the court's time. That even under such circumstances out of approximately 100 witnesses who have appeared, 91 of whom have testified, approximately 30 per cent. thereof have been challenged by the plaintiff as being disqualified, and about 11 per cent. thereof have been held disqualified by the court.

4. That if the court will postpone and adjourn the further hearing of this cause for a reasonable time, plaintiff will be able to make a fair check of the qualifications of persons voting at such election, as disclosed by the records. in the precinct registers, in the office of the secretary of the county election board and in the offices of the county clerk and county treasurer of Oklahoma county, will be able thereby to reduce the number of witnesses to be subpoenaed and called, thereby reducing the expense to where plaintiff can carry the burden, by eliminating the great amount of wholly unnecessary expense, and thereby speed up the trial, to the saving of the time of the court and of all others concerned.

"Plaintiff says that if such a postponement is granted, the saving in time would be sufficient that the end of the hearing would not, in his judgment, be delayed.

"In this connection, plaintiff frankly says that, if he is compelled to carry the above-described unwarranted expense, he will be unable to proceed further with the presentation of his case, and will thereby be deprived of a full and fair hearing before the courts.

"Plaintiff says that he filed and has prosecuted this action in good faith; that he filed the action at an early date and before he had time to assemble his testimony in order that he might not be charged with bad faith in waiting until after the bids for bonds had been received and the bonds sold before filing his suit; that he has throughout this cause acted in entire good faith, as hereinbefore shown, and is now acting in good faith and with entire frankness in presenting this motion."

The issue we must now determine is whether the trial judge abused his discretion in overruling the last application. This requires us to determine whether the showing made by the plaintiff was sufficient to take him outside the rule announced in Logan v. Young, supra.

The plaintiff's contentions may be summarized thus: (1) An admittedly defective or irregular affidavit was furnished, and probably more than 3,000 such affidavits were used by voters; (2) this led to voters being permitted to vote who were not eligible; and (3) enough such ineligible voters voted to cast doubt upon the validity of the election; by reason of all of which the application to open the box and check into the eligibility of the affidavit voters was reasonable.

The trial judge was impressed by the fact that many of the allegations of the plaintiff's petition relating to fraud and other irregularities were wholly unmentioned in the proof and therefore wholly unproven. The plaintiff virtually conceded as much, but did insist that the proof submitted relating to the use of the affidavit and of the illegal votes cast was

sufficient to support a prima facie showing of constructive fraud and to show irregularities of sufficient importance to reasonably support his application to open the ballot boxes and to inspect the affidavits used and investigate the eligibility of the voters who used those affidavits.

The defendants answer the plaintiff's contentions by asserting that there is no proof that the use of the particular form of affidavit misled any voter or induced the election officials to permit the ineligible voters to vote, and they insist, on the contrary, that the election officials may have used other methods of determining the eligibility of prospective voters, and that it is not reasonable to presume that the affidavits were the only tests used. Defendants also assert that a study of the entire evidence discloses that very few of the witnesses who were ineligible to vote used the affidavit.

This election was held February 20, 1940, and the result thereof was known within a few days. Several days elapsed between that time and the time the motion of March 15th, to inspect the affidavits in the ballot boxes, was filed. Between the election date and the filing of the second application, about 30 days elapsed. It is alleged in the above application to inspect the affidavits that plaintiff had from eight to twelve checkers investigating in the offices of the county clerk and county treasurer. About 90 voters were subpoenaed and testified. A large majority of those voters who testified at the trial were admittedly fully qualified, and only a negligible number of those called were disqualified or doubtful. We think the trial judge was justified in taking this into consideration. In other words, if all of the time and effort mentioned in the second application was spent and no greater result was produced therefrom, the trial judge was justified in believing that no reasonable showing was made for opening the ballot boxes. It is reasonable to assume that every bit of favorable evidence found was used, and yet all that was

found and used presented little support for plaintiff.

We analyze the evidence to some extent. Eliminating from this consideration the testimony of certain witnesses who are not voters, we find there is evidence from about 90 voters. Of this number, five were shown to be ineligible, and eight were shown to be of doubtful eligibility. These 13 voters were about evenly divided for and against the proposition.

This seems to us an almost negligible showing on the part of the plaintiff, and we would be unwilling to say that the trial judge abused his discretion in declining to use such a showing as a reason for opening the ballot box.

We again quote from the opinion in Logan v. Young, supra, as follows:

"There is also a well-established rule of law that public officials are presumed to do their duty. We therefore have, not only a legal presumption that each of the election officials of the various precincts did their duty, and properly tabulated and counted the votes in their respective precincts, but we have a statutory provision which makes their returns prima facie evidence of the correctness of said vote. Although the ballots are the best evidence, and under certain conditions may, when they have been properly preserved, be recounted under direction of the court, yet we do not think that it was ever intended that the above presumption should be disregarded, and the ballots used as original evidence for the purpose of discovering possible errors. To justify their use as against the returns, there must be such preliminary evidence as the trial court may, in the exercise of its sound discretion, determine sufficient to overcome such presumption. To open the ballot boxes and count the ballots without such proof would be to reject the returns and ignore the certificate of election. It would be tantamount to saying to the defendant that, although the returns show you received a majority of the votes cast, and although a certificate of election has been issued to you, and although the returns are prima facie evidence of the vote cast, and although the law presumes that the election officials have done their duty,

yet, since the plaintiff has made an allegation that the returns are false, fraudulent, or erroneous, the court, without any evidence whatever to overcome such prima facie evidence and presumption, is going to disregard the same, and require you to come into court and prove by the ballots (the very ballots which have been counted by the officials designated by law to make the count, and to whose every act every presumption of regularity attaches) that you are the duly elected sheriff of Stephens county, Oklahoma.

"To do this would be to totally disregard the expressed provisions of our statutes and the decisions of this court on this question. It will not do to say that the presumption as to the correctness of the returns may be overcome by a recount of the ballots, because the moment the court begins to count the ballots the returns have been disregarded, thrown aside, and held for naught. Otherwise, there would be no need to count the ballots.

"All contenton at this stage of the proceedings about the ballots being the best evidence of the votes cast is begging the question, until said prima facie evidence and presumptions are overcome and the returns are destroyed. Then, and then only, does an issue arise which requires that the ballot boxes be opened and the ballots counted by the court. Any other rule would practically eliminate the necessity of the ballots being counted by the election officials, as defeated candidates invariably believe that a mistake has been made, and would so allege in order that they might go on a 'fishing expedition' and perchance, by a recount of all the ballots cast, discover a mistake in the election returns as made."

Plaintiff continually alludes to the fact that a newspaper campaign was carried on against him charging him with delaying the trial and seeking to unreasonably hinder the bond issue, and he points out that the case was actually filed, the issues joined, and the trial set by agreement before 30 days elapsed. He says that his willingness to agree to an early trial evidenced his good faith but worked to his disadvantage by taking him into the trial before he was fully prepared. The law expressly governs the time that must elapse before a case may be called for trial, and he could not have been forced to trial earlier against his will. If he had a cause of action that needed extended preparation, he should have taken the time for adequate preparation as allowed by law.

After a consideration of the whole record, we are of the opinion that the trial judge did not abuse the discretion vested in him when he refused to order the ballot boxes opened, upon the showing made, to permit an examination of the affidavits that were used to investigate the eligibility of the affiants to vote.

We are also of the opinion that the trial judge did not err in sustaining the demurrer to the plaintiff's evidence, and in denying judgment.

The judgment is affirmed.

RILEY, OSBORN, GIBSON, HURST, DAVISON, and NEFF, JJ., concur. WELCH, V. C. J., and CORN, J., absent.