BROWN *v.* GRZESKOWIAK.

[No. 28,761. Filed November 8, 1951. Rehearing denied December 5, 1951.]

116

*Eli F. Seebirt, S. J. Crumpacker, Warren E. McGill, George M. Eichler* and *Joseph G. Ettl,* all of South Bend, for appellant.

*Robert Hollowell,* of Indianapolis; *George Sands, Edward V. Minczeski, Theodore E. Prekowitz, John C. Shively,* all of South Bend, for appellees.

BOBBITT, J.—The parties were candidates for the office of clerk of the St. Joseph Circuit Court at the general election held on November 7, 1950. The appellant was declared elected by the county board of canvassers, and a certificate of election was issued to her.

On November 20, 1950, the appellee filed his complaint in 14 rhetorical paragraphs to contest the appellant's election and for a recount. A board of recount commissioners, duly appointed, reported that appellee had received a plurality of all votes cast, and a certificate of election was issued to him. In the contest proceedings which followed the trial court decided that appellee was duly elected to the office.

Following detailed formal allegations in the first six paragraphs of the complaint, paragraph 7 thereof reads as follows:

"That such petitioner—contestor—desires to contest such election upon the grounds and for the reasons:

"1.—Irregularity and malconduct of said County Election Board and County Board of Canvassers, all as hereinafter more particularly set out and referred to; and

"2.—On account of mistake in the official count of said votes cast at said election.

"That he honestly believes that as a result of the facts set forth herein as grounds of contest, said contestee—Marcella Brown—was declared to have been elected to said office of Clerk of the St. Joseph Circuit Court when she had not, in fact, received the highest number of votes therefor."

Paragraph 8 alleges in substance that said County Election Board received sealed envelopes containing marked absent voters' ballots, 46 in number, in time for said board to deposit them with the appropriate precinct election boards before the closing of the polls, but that said board wrongfully and unlawfully failed, neglected and refused to so deliver them. That the board did unlawfully keep and retain, after the closing of the polls, the possession of said marked ballots sealed in said envelopes, and that the board did then open the envelopes and aggregate and tabulate the votes.

Paragraph 9 alleges that the County Election Board and Board of Canvassers were guilty of irregularities and malconduct in that (a) the St. Joseph County Election Board failed, neglected and refused to deliver said purported unrejected absent voters' ballots and application, 46 in number, to the inspectors of the several precincts, to be voted before the closing of the polls; (b) as a result the inspectors and precinct election officers did not open the carrier envelopes containing said absent voters' ballots, announce their names and compare the signatures; that the ballots were not delivered to the precinct clerks for initialing; and the inspectors did not deposit the ballots in a ballot box, and the names of these 46 persons were not entered upon the poll lists; and (c) because of these failures the precinct inspectors did not notify the challengers and poll book holders that he was about to deposit these ballots.

Paragraph 10 alleges that the Election Board and County Board of Canvassers tabulated and canvassed the votes cast for appellant and appellee, and when they finished their work the following day, the tally sheets so kept by the board showed that 40,575 votes were cast for appellee and 40,558 were cast for appellant.

Paragraph 11 alleges that thereupon said boards opened said sealed envelopes containing said 46 absent voters' ballots; took out the ballots; determined that of said 46 ballots 7 had been voted for appellee and 39 had been voted for appellant; entered said votes in the tally sheets and thereby showed and determined that appellant had received 40,597 votes and appellee had received 40,582 votes; that the board made a memorandum of the names and addresses of the 46 voters and of the precincts in which they claimed the right to vote; that the appellee does not know the names or addresses of the 46 voters or of the precincts in which they claimed the right to vote, and has set out all the facts of which he has knowledge.

Paragraph 12 alleges that on November 16, 1950, the county boards caused a statement to be drawn that all said ballots be counted for all candidates and offices, and thereby it was shown that appellant received 40,597 votes and appellee received 40,582 votes, and appellant was declared elected.

Paragraph 13 alleges that by reason of the inclusion of the 46 ballots appellant received 40,597 votes and appellee received 40,582 votes, and Hunt, the third candidate (on the Prohibition ticket) received 491 votes; that said 46 ballots were included in the total of 81,670 votes cast; that by reason of the facts hereinbefore set out said 46 ballots and the votes attempted to be cast thereby were and are void, and should not

have been counted, and "consequently the total number of legal and valid votes cast at said election for said office of clerk of the St. Joseph Circuit Court is the total of 81,624, and that of said number of legal and valid votes so cast said contestor received 40,575, said contestee, Marcella Brown, 40,558, . . ., and that said contestor, having received a majority of the legal votes cast for said office, was elected thereto by a majority of 17 votes; that the irregularity, malconduct and mistake of said County Election Board and County Board of Canvassers hereinbefore set out and alleged, was such as to cause said contestee, Marcella Brown, to be declared elected when she had not received the highest number of lawful votes at said election. . . ."

Paragraph 14 alleges that appellee was a candidate for said office at said election; that there were 151 precincts in the county, and that the office was voted upon in each and all of said precincts. It alleges the names and postoffice addresses of each of the opposing candidates, and further alleges that said petitioner—contestor—desires a recount of all of the votes at said election with respect to all of said precincts within said county; that he in good faith believes that either through mistake or fraud the votes cast for such office at said election in all of said precincts were not correctly counted and returned; that he desires to contest said election with respect to said office; that he desires a recount of all of the votes cast for said office in said 151 precincts.

In the prayer for relief appellee asks that a recount commission be appointed to make a recount, and with respect to the contest proceedings that the court hear and determine the issues raised by this petition and any answer filed thereto, and that the court declare the appellee elected and give judgment accordingly.

The statute designates those who may contest an election, §29-5501[1], and prescribes the causes for an election contest, §29-5502[2]. In §29-5504 it is provided that one desiring to contest an election shall file, within 15 days after election day, his verified petition setting out that he desires to contest such election, stating the names of all candidates at such election for the office involved, and specifying therein some *one or more* of the grounds for contest provided for in §29-5502, and that he honestly believes that as a result of the facts set forth as a ground of contest, the contestee was declared elected when he had not in fact received the highest number of votes. If such contest is upon the ground of fraud or mistake in the official count, then if such contestor desires a recount of the votes cast for such office he shall so state in his petition, and a recount may be had under the provisions of §§29-5401 to 29-5417. Section 29-5409 provides that the petition therefor *shall* be granted upon the filing of the petition and undertaking. Section 29-5414 provides that the recount certificate supercedes for all purposes all previ-

---

[1] All statute references are to Burns' 1949 Replacement, unless otherwise stated.

[2] "Any election, the contest of which is now pending or hereafter commenced, and which is provided for in this or in any other article, may be contested for any of the following causes, and for none other.

"First. For irregularity or malconduct of any member or officer of any precinct election board or the county election board.

"Second. When the contestee was ineligible.

"Third. When the contestee, previous to such election, shall have been convicted of an infamous crime, such conviction not having been reversed nor such person pardoned at the time of such election.

"Fourth. On account of mistake or fraud in the official count of the votes. (Acts 1945, ch. 208, §342, p. 680.)"

ous returns made in any form of the votes thus recounted, and certified copies thereof shall be *prima facie* evidence of the votes cast for such office in such precincts in any contest or other proceeding in which there is an issue as to the votes cast at such election for such office.

Three questions determine the outcome of this action.

*First:* Appellant contends that the complaint puts in issue only the validity of the 46 absent voters' ballots therein referred to, it being her theory that the allegation of "mistake in the official count" can only refer to the alleged "mistake" of the County Canvassing Board in including the 46 ballots.

However, the complaint is broader in its scope. It does not merely allege "mistake" on the part of the County Election Board and County Board of Canvassers, but alleges irregularity and malconduct as authorized by the first clause of §29-5502. Much of the complaint is devoted to detailed allegations of irregular conduct on the part of the canvassing board in connection with said 46 absent voters' ballots. But it further alleges mistake in the official count of the votes as authorized by the fourth clause of the section. This latter allegation must refer to the precinct boards. It could hardly have reference to the alleged irregularity and malconduct of the canvassing board, for it is the duty of the canvassing board to aggregate and tabulate, and not to count, the votes. Section 29-5211, Burns' 1949 Replacement; *State ex rel. Brown* v. *St. Joseph Circuit Court* (1950), 229 Ind. 72, 95 N. E. 2d 632; *Kunkle* v. *Coleman* (1910), 174 Ind. 315, 92 N. E. 61.

This is a special statutory proceeding. The act is specific as to what shall constitute a sufficient petition

for contest or recount. See *Gossard* v. *Vawter* (1939), 215 Ind. 581, 21 N. E. 2d 416. The petition here follows the statute and evidence discovered in a recount proceeding is admissible under allegations of a complaint which are in the words of the statute. *Cleveland C. C. & St. L. Ry. Co.* v. *Gillespie* (1933), 96 Ind. App. 535, 541, 173 N. E. 708; *Pittsburg, etc. R. Co.* v. *Newsom* (1905), 35 Ind. App. 299, 304, 74 N. E. 21; *Wood* v. *Hartman* (1943), 381 Ill. 474, 45 N. E. 2d 864.

It is expressly provided that more than one of the statutory grounds for contest may be alleged, from which it follows that each statutory ground alleged may be considered independently of any other. Our law does not provide, as it formerly did, that an election may be contested "on account of illegal votes", yet an election cannot be permitted to rest on illegal votes or ballots, and so the allegation of a "mistake . . . in the official count of the votes" must be sufficient to raise more than a mere mistake in the mathematical computation of the votes cast. It reaches mistakes, if any there were, in counting illegal, invalid and void votes.

We agree with appellee that the statutory proceeding for recount is in the nature of a bill of discovery. *State ex rel. Watson* v. *Pigg, Judge* (1943), 221 Ind. 23, 46 N. E. 2d 232. A recount puts at issue the validity of all the ballots in every precinct which it covers.

An allegation of mistake in the official count of the votes is a broad and comprehensive ground for contest. The recount affords an examination of ballots and documents from which it may be determined what votes may be legally counted. The provisions of our law for the impounding and safekeeping

of election documents and paraphernalia are such that it would be a practical impossibility for a contestor to discover, before the filing of his petition, whether each ballot was valid or invalid. "It is apparent that the legislature, in contest proceeding, did not intend the observance of strict technical rules of pleading, but rather contemplated liberal rules of pleading so that the end sought to be accomplished, viz, to determine, upon the merits of the case, who of the qualified candidates in fact received the highest number of legal votes", *Martin* v. *Youngblood* (1937), 211 Ind. 647, 657, 7 N. E. 2d 997. To require a party to allege facts which could not well be in his possession, or reasonably discoverable by him, would tend to nullify the law itself. See *Goecker* v. *McOsker* (1912), 177 Ind. 607, 98 N. E. 724. The sufficiency of the complaint was in no way challenged. No question concerning the admission of evidence arose under it. It must be considered sufficient to question the legality and validity of the votes considered by the recount commissioners, and for whom they were cast.

*Second:* The appellant further contends that the appellee is conclusively bound by the allegation in Paragraph 13 of the complaint, above quoted, that a total of 81,624 legal and valid votes were cast, of which appellant received 40,558 and appellee received 40,575. In the examination of the voting machines, mistakes were found which increased appellant's vote by 23 and decreased appellee's vote by 60. She reasons that if appellee's 40,575 votes, as alleged, is reduced by 60 to 40,515, and appellant's 40,558 votes, as alleged, are increased by 23 votes to 40,581 votes, she (appellant) was elected by 66 votes regardless of the 46 absent voters' ballots. In support of this contention cases are cited which announce the general rule that parties are bound by the allegations of their pleadings.

The effect of the allegation under consideration is that the appellee was elected if 81,624 legal and valid votes were cast, of which he received more than one-half, to-wit: 40,575 votes. The appellant answered Paragraph 13 of the complaint as follows: "She denies all the allegations contained in rhetorical paragraphs Nos. 13 and 14 as to the right of a recount and as to the alleged election of the Contestor."

Under Rule 1-3[3] the party answering a pleading is required to state that he (1) admits, (2) denies, or (3) is without information as to the facts alleged. Appellant's answer contains no admission of any fact alleged in paragraph 13. It specifically denies that the appellee was elected, although he must have been elected if 81,624 legal and valid votes were cast, of which he received 40,575. "A party wishing to avail himself of an admission or averment in a pleading of the adverse party must accept it as an entirety." 71 C. J. S. Pleading, §61c, p. 156. He cannot split it up, accept part of it, alter that part by proof, and claim the benefit of the result. See *Stock* v. *Schloman* (1930), 226 Mo. App. Rep. 234, 42 S. W. 2d 61. Moreover, a party cannot take advantage of an admission in the pleading of his adversary where he has denied the truth of the allegation and joined issue upon it, 71 C. J. S., Pleading, §59c, p. 152, even though the denial be an indirect one. *Meredith* v. *Lackey* (1860), 14 Ind. 529, Id., 16 Ind. 1.

Furthermore, in keeping with our belief that each statutory ground alleged may be considered independently of any other, we think the binding effect of the allegation under consideration, if any it did have, would be confined to the allegations made pursuant to the first clause of §29-5502. It purports to relate

---

[3] Rules Supreme Court of Indiana, 1949 Revision.

to no other. Under the circumstances here, appellee is not conclusively bound by the allegations in paragraph 13 of his complaint.

*Third:* Were the absent voters' ballots illegal because they bore only the initial letters "D.L.M." of the clerk's name instead of his full signature?

All votes at the election were cast on machines or by absent voters' ballots. The machine count as finally determined was 40,391 votes for the appellee and 40,208 votes for the appellant. That fact is not controverted. The appellant was, therefore, lawfully elected only if she received a sufficient number of valid absent voters' votes to change the result shown by the machines. In addition to the machine vote, 527 absent voters' ballots were tabulated and counted. The appellee offered these ballots, along with the applications therefor and the envelopes in which the ballots were returned, and they were admitted into evidence in the contest proceedings. In offering these exhibits the appellee stated that they were not offered as being legal or illegal, valid or invalid, but were offered as the best, primary and most reliable evidence from which the court could determine the issues in the case; that is, the number of valid and legal votes received by the candidates at said election and which candidate received a majority thereof. The appellant objected to the "offer of all these exhibits with the conditions, limitations and exceptions stated in the offer."

No error is assigned in the admission of these exhibits. They were admissible in evidence, §29-5201, but it is claimed that the appellee, having alleged in his complaint that they were legal and valid, and having offered them in evidence, is estopped to assert their invalidity. We disagree. The legality of these ballots was for the court to determine. An inspection of these exhibits was essential. They were not

offered as legal or illegal, valid or invalid, but were offered for the sole purpose of aiding the court in determining the fact of their legality and validity from an inspection of the documents themselves. We clearly are of the opinion that, under the circumstances, the appellee is not estopped to now deny the legality and validity of these ballots. See 20 Am. Jur., Evidence, §915, p. 771; 32 C. J. S., Evidence, §1040, p. 1114; 17 Ann. Cas. 382.

As above observed, since appellee received a majority of 183 votes on the machines, it is apparent that appellant was lawfully elected only if she received enough absent voters' votes to change the result shown by the machines. It is appellee's contention that none of the 527 absent voters' ballots were valid and none should be counted for either candidate because initial letters of the name of the clerk of the circuit court were placed on the back of all 527 ballots instead of his full name—the clerks initials are not sufficient to constitute a "signature" within the meaning of that term as used in §200 of the 1945 election law.

Section 29-4907, Burns' 1949 Replacement, provides in part that:

> ". . . Before mailing or delivering any ballot the clerk [of the circuit court] shall affix his official seal and place his signature near the lower left hand corner on the back thereof leaving sufficient space on the margin of such ballot for the initials of the poll-clerks."

The initials "D.L.M." appear on the back of *each and all* absent voters' ballots cast. Is this sufficient to authenticate these ballots?

Appellee relies upon the case of *Werber* v. *Hughes* (1925), 196 Ind. 542, 148 N. E. 149, in which this court held that 5 absent voters' ballots were illegal and void because they did not bear the seal of the clerk of the

circuit court. In that case it was held that the requirement of the statute (Acts of 1919, ch. 156, §5, p. 694) which reads as follows:

"Before mailing or delivering any ballot the clerk shall affix his official seal and place his signature near the lower left hand corner on the back thereof leaving sufficient space on the margin of such ballot for the initials of the poll clerks.",

is mandatory. The language there under consideration is identical with the language of §29-4907, Burns' 1949 Replacement which must control in this case.

It will be noted that the question of the manner of placing the clerk's signature upon the ballot was not before the court in *Werber* v. *Hughes* (1925), 196 Ind. 542, 148 N. E. 149, *supra*. We must here determine whether or not the placing of the initial letters of the name of the clerk of the circuit court upon an absent voter's ballot before it is mailed to the voter, is sufficient to satisfy the requirements of the statute above quoted relating to the signature of the clerk, after the ballot has been cast and counted. The purpose of such requirement in absent voters' laws is to safeguard and identify the ballot as an official ballot. *McCardle* v. *Holcomb* (1939), 216 Ind. 267, 269, 23 N. E. 2d 470.

Having heretofore determined the purpose of said requirement it follows that we may decide under what circumstances the purpose has been fulfilled.

In the absence of fraud, election statutes generally will be liberally construed to guarantee to the elector an opportunity to freely cast his ballot, to prevent his disfranchisement, and to uphold the will of the electorate. *Jones* v. *State, ex rel. Wilson* (1899), 153 Ind. 440, 55 N. E. 229; *Blue* v. *Allee* (1916), 184 Ind. 302, 111 N. E. 185; *State ex rel. Harry*

v. *Ice* (1934), 207 Ind. 65, 191 N. E. 155, 92 A. L. R. 1508; *Duncan* v. *Shenk* (1887), 109 Ind. 26, 30, 9 N. E. 690; *Dobbyn* v. *Rogers* (1948), 225 Ind. 525, 76 N. E. 2d 570, 582; 18 Am. Jur., Elections, §11, p. 188, also §225, p. 331. The intention of the legislature, as ascertained from a consideration of the act as a whole, will prevail over the literal meaning of any of the terms used therein. *Cyrus* v. *State* (1924), 195 Ind. 346, 145 N. E. 497.

We are, however, here concerned with the legality of absent voters' ballots. This court in *Brown* v. *State ex rel. Stack* (1949), 227 Ind. 183, 84 N. E. 2d 883, at p. 190 said:

> "Absentee voting is an exception to the general rule and is in the nature of a special right or privilege which enables the absentee voter to exercise his right to vote in a manner not enjoyed by voters generally."

Absentee voting is designed for those voters whose duties prevent them from being present at their polling places on election day and the statutes authorizing such voting confers a special privilege upon this class of voters. Such statutes are in derogation of the general election laws and in some jurisdictions are strictly construed.

Even though such statutes do, under certain circumstances, extend a special privilege to those who may be away from their voting place on election day, it must be kept in mind, even when applying the rules of strict construction, in ascertaining the meaning of the language used together with the intent of the Legislature, that the will of the majority of those who have legally voted is the thing to be most desired.

This court, speaking of the general election laws, in *State ex rel. Harry* v. *Ice* (1934), 207 Ind. 65, 191 N. E. 155, 92 A. L. R. 1508, *supra,* at page 71 said:

> "The purpose of the law and *the efforts of the court* are to secure to the elector an opportunity to freely and fairly cast his ballot, and to uphold the will of the electorate and prevent disfranchisement. In the absence of fraud, actual or suggested, statutes will be liberally construed to accomplish this purpose." (Our italics).

Since the Legislature has extended the privilege to certain voters who may be absent from their voting places on election day, to cast their ballots, even though absent from the polling place, the same effort must be made to extend to them an opportunity to freely and fairly cast their ballots and to prevent their disfranchisement as is made to protect the ballots and prevent the disfranchisement of those voters who are present at their voting place and cast their vote in person.

The ultimate question for determination in an election contest is, who has received the highest number of legal votes? *Goecker* v. *McOsker* (1912), 177 Ind. 607, 616, 98 N. E. 724, *supra.*

While this court has held that the provision requiring the clerk's seal and signature is mandatory, *Werber* v. *Hughes* (1925), 196 Ind. 542, 148 N. E. 149, *supra,* and it will be strictly enforced, however, for the purpose of ascertaining whether or not there has been sufficient compliance to accomplish the purpose of the Legislature, such provision will be liberally construed, and a substantial compliance is all that is necessary to legalize and make official absent voters' ballots cast in good faith, in the absence of fraud.

It has been held that ignorance, inadvertence, mistake, or even intentional wrong or the performance by

an election official of his duty in a mistaken manner will not disfranchise an election district.

Section 497, p. 418, §499, p. 421, and §502, p. 424, Paine on Elections.

The rule is ably stated in *Griffith* v. *Bonawitz* (1905), 73 Neb. 622, 626, 103 N. W. 327, at p. 329 as follows:

"It is notable that in both cases the objections that are made to individual ballots are of a character that is commonly described as 'technical.' That is to say, the purpose or intent with which they were cast is not in doubt, and the honesty of the voter is not questioned, but it is sought, by one party or the other, to defeat that intent because of some alleged defect or informality, the evident result of innocent awkwardness, mistake, or ignorance."

. . . .

"Unless this country has recently undergone a revolution that has escaped our notice, a voter can be lawfully deprived of his suffrage or a popular election can rightfully be quashed for only a few causes, namely, fraud or corruption, intimidation or violence, or such gross irregularity as renders the ascertainment of the will of the individual or of a majority, or a plurality, as the case may be, impossible."

This principle was recognized by this court and the same protection applied to absent voters' ballots as apply to ballots cast in person, in *McArtor* v. *State, ex rel. Lewis* (1925), 196 Ind. 460, 148 N. E. 477, which case was decided in the same term of court in which the case of *Werber* v. *Hughes* (1925), 196 Ind. 542, 148 N. E. 149, *supra,* was decided when, at page 468, it said:

"In the instant case, it does not appear that any of the absent voters' ballots complained of were voted by persons who were not legal voters of the precinct in which they were cast and it appears that the voters in each instance had placed them in

the hands of the clerk of the circuit court in the manner provided by law.

"The ballots having been delivered to and received by the election officers and the counting of the ballots completed, *the acts* of the board and *of all officers* are taken as directory and the voter who gets his vote inside the election room in the manner and within the time prescribed by law, then, so far as he is concerned, he has voted, and if the *officers,* inspectors and judges and clerks fail to do their duty in any way, then that is deemed by the law as directory, and the one who is voting has a right to have his vote deposited in the ballot box and counted even though it be after six o'clock. It is the voter himself who has the right. These officers might be punished for what they did, but the voter has a right to have his vote counted. The right of the voter is paramount and the neglect of the election officers or even their fraud should not be allowed to deprive the voter of his important right and duty as a citizen to cast his vote and have it counted as cast. Any other rule would, to a dangerous extent, leave the results of elections in the hands of the election officers, when the intention of the statute is to promote the exercise of free government by all of the lawful voters of the country, and not to leave it in the hands of the officers selected under the law to serve them." (Our italics).

This principle was further extended by this court in *McCardle* v. *Holcomb* (1939), 216 Ind. 267, 23 N. E. 2d 470; *supra,* wherein the validity of certain absent voters' ballots was contested because the ballots bore the seal of the clerk and the signature "D. D. Morgan" without any designation as to whether or not D. D. Morgan was the clerk of the circuit court. In deciding this question, the court, 216 Ind. at page 270, said:

"In the case before us the purpose of the statute, as we have said, is to preserve the purity of the ballot. There is no express provision that the signature be accompanied by an official designation,

although the word 'official' is used in connection with the requirement for the use of the seal. If the absent voters who received the ballots had taken the precaution to examine the statute to see whether the ballots were legal, it cannot be said that they would have been justified in rejecting them and demanding others. To reject these ballots after they have been voted would be to disfranchise the voters who used them, upon the ground that, while the letter of the statute was followed in authenticating them, the words, 'his signature,' as used in the statute, required something more than is ordinarily implied in common parlance by the use of that expression. There is no suggestion that the ballots were illegally obtained by the voters, or that their use impaired the honesty or secrecy of the election or violated the spirit of the election laws. *Under such circumstances, the mere irregularity,* if it was an irregularity, *of an election officer will not be permitted to disfranchise the voter."* (Our italics).

The act of the county clerk in performing his duty, of placing proper identification upon absent voters' ballots before they are mailed to the voters, in a mistaken manner, will not be allowed to invalidate the ballots and disfranchise the voters when the manner in which the duty is performed is such as to satisfy the requirement of the statute for proper identification of the ballot, and to assure the voter and the election board officials that it is an official ballot. *McCardle* v. *Holcomb* (1939), 216 Ind. 267, 23 N. E. 2d 470, *supra.*

It seems clear that the sole intention of the Legislature by the enactment of this provision was to provide a proper identification of absent voters' ballots whereby not only the voter who received the ballot, but the various election board officials, would be able to determine, upon examination of the ballot, whether or not it was a valid official ballot

which had been sent out from the county clerk's office in the manner provided by law. When the county clerk has performed his duty in connection with the signing, sealing and mailing of absent voters' ballots in such a way as to authenticate and identify them in such a manner as to cause the voter who received them, upon inspection thereof, to conclude that the ballot is official, and such authentication and identification is accepted as being proper, by the various election board officials in all the precincts to which any absent voters' ballots are returned, then it must be said that such authentication and identification satisfies the requirements of the statute.

In the case at bar there is no evidence that any voter returned any ballot which was sent to him, by reason of any doubt as to its official nature. There is no contention by either party, and no evidence in the record to show, that the official nature of any of these 527 ballots was questioned by any of the election board officials in any of the 117 precincts to which they were delivered.

It was said by this court in *McCardle* v. *Holcomb* (1939), 216 Ind. 267, 23 N. E. 2d 470, *supra,* at p. 269, in construing the same provision which is here under consideration, "It cannot be doubted that a ballot signed by the clerk with his own personal signature, and bearing the official seal of his office, is sufficiently authenticated to provide the protection desired, and it is not contended here that by any possibility the ballots used and voted were not the ballots furnished by the clerk, or that, by the omission of an official designation of title after his name, it was possible that any other or different or unofficial ballots might have been substituted."

It is not contended in this case that by any possibility the ballots used and voted were not the

ballots furnished by the clerk or that by the substitution of the initial letters of the clerk's name for his full signature it was possible that any other or different or unofficial ballots might have been substituted. Under such circumstances it cannot be doubted that the 527 absent voters' ballots here involved were sufficiently authenticated to provide the protection desired and to satisfy fully the statutory requirement for proper identification.

If further proof were needed that the absent voters' ballots here in question were sufficiently identified to satisfy the requirements of the statute, it is furnished conclusively by the fact that the 527 people who voted these ballots voted and returned them to the county clerk's office without question as to their validity or official nature.

In construing the provision of the election law requiring the clerks of the election board to indorse their initials on the official ballots this court, in *Parvin* v. *Wimberg et al.* (1892), 130 Ind. 561, 30 N. E. 790, 15 L. R. A. 775, at p. 572, said:

"... the purpose of the Legislature is accomplished when the indorsement is made in such manner as to enable the election officers, in conducting the count, to identify it as the official ballot."

Both, the provision requiring the ballots to be indorsed with the initial of the poll clerk and the provision requiring the clerk of the circuit court to affix his official seal and attach his signature to the absent voters' ballots have been held by this court to be mandatory. The conclusion of the court as to what was necessary to properly identify an official ballot in the Parvin v. Wimberg et al. case, therefore, applies with equal force in determining when the requirements of

the statute, providing the methods for indorsing absent voters' ballots, have been satisfied and their purpose fulfilled.

It will be observed that §29-4907, Burns' 1949 Replacement, above referred to, does not provide that the clerk shall place his full name on the ballot but only that he shall "place his signature" thereon.

Initials may under certain circumstances constitute a legal signature.

"Signature" was defined by the Supreme Court of Pennsylvania In re *Knox's Estate* (1890), 131 Pa. 220, 230, 231, 18 Atl. 1021, 6 L. R. A. 353, where the deceased signed her will using only her given name, as:

> "The precise case of a signature by the first name only, does not appear to have arisen either in England or in the United States; but the principles on which the decisions already referred to were based, especially those in regard to signing by initials only, are equally applicable to the present case, and additional force is given to them by the decisions as to what constitutes a binding signature to a contract under the same or analogous statutes. Browne, On the Statute of Frauds, §362, states the rule thus: 'In cases where the initials only of the party are signed, it is quite clear that, with the aid of parol evidence which is admitted to apply to them, the signature is to be held valid.' And see Palmer v. Stephens, 1 Den. 478; Sanborn v. Flagler, 9 Allen 474; Weston v. Myers, 33 Ill. 432; Salmon Falls Co. v. Goddard, 14 How. 446; Chichester v. Cobb, 14 Law. T., N. S. 433."
>
> . . . .
>
> "So the form which a man customarily uses to identify and bind himself in writing is his signature, whatever shape he may choose to give it."

The Supreme Court of Arizona considering a will which was signed by the making of a mark thereon, in the case of In re *Wilkins' Estate* (1939), 54 Ariz. 218, 224, 94 P. 2d 774, 776, said:

"It has been decided that a mark is sufficient, and that, notwithstanding the testator is able to write, and though his name does not appear on the face of the will. A mark being sufficient, of course the initials of the testator's name would also suffice. ... See, also, 1 Commentaries on the Law of Wills, Alexander, pp. 578, 579, 580; 1 Jessup-Redfield 519 et seq.; 40 Cyc. 1102."

In *Bustillos* v. *State* (1948), 152 Tex. Cr. R. 275, 282, 213 S. W. 2d 837, 841, the Court of Criminal Appeals of Texas, in determining whether a mark which defendant had made on a confession was a signature said:

"We express the opinion that the making of this mark on the bottom of this instrument is a signature thereto. We find a similar question passed upon by the Supreme Court of California in the case of In re Walker's Estate, 110 Cal. 387, 42 P. 815, 816, 1082, 30 L. R. A. 460, 52 Am. St. Rep. 104, in which it is said:

" 'To "sign," in the primary sense of the word, is to make any mark. To sign an instrument or document is to make any mark upon it in token of knowledge, approval, acceptance, or obligation. The signature is the sign thus made.'

"Again, in the case of Board of Trustees of Seventh St. Colored M. E. Church v. Campbell, 48 La. Ann. 1543, 21 So. 184, 187, the Supreme Court of Louisiana quoted from Sweet's Law Dictionary as follows:

" 'In the primary sense of the word, a person "signs" a document when he writes or marks something on it in token of his intention to be bound by its contents. In the case of an ordinary person, signature is commonly performed by subscribing his name to the document, and hence "signature" is frequently used as equivalent to "subscription," but *any mark is sufficient if it shows an intention to be bound by the document.* Illiterate persons commonly sign by making a cross.' " (Our italics).

This court has held that a promissory note signed by the mark of a maker is valid without a subscribing witness. *Shank* v. *Butsch* (1867), 28 Ind. 19.

We have also held that a mortgage signed by the christian name only is sufficient to authenticate the mortgage and bind the signor. *Zann et ux.* v. *Haller* (1880), 71 Ind. 136.

While the above cases do not involve the question of a proper signature on an election ballot, we believe the rule therein enunciated applies with equal force to the facts in the case at bar.

It may be concluded, without successful contradiction, that the initials "D.L.W." were placed on all of the absent voters' ballots issued from the office of the St. Joseph County Clerk in the general election of 1950, as an authentication thereof and for the purpose of identifying them as official ballots and under the ruling of the cases above cited, this is sufficient to constitute a "signature". When the purpose of the absent voters' act as a whole is considered, the placing of the initial letters of the clerk's name on all absent voters' ballots under the circumstances in this case was sufficient to constitute his "signature" within the meaning of the statute.

The question of what constitutes a signature of election officials under provisions of election laws requiring ballots to be signed by certain officials has been decided in a number of states.

The Supreme Court of Illinois in determining whether compliance was had with the provision of the election law requiring the judges of elections to indorse their initials on the back of a ballot where only one initial was used, in *Perkins* v. *Bertrand* (1901), 192 Ill. 58, 63, 61 N. E. 405, at p. 408 (N. E.) said:

"A number of ballots were counted which had indorsed upon the back thereof only a single initial

of one of the judges of election. The object of requiring one of the judges of election to officially indorse on the back of the ballot his initials before giving it to the voter is to identify the ballot as being one which had been cast at the election. Such identification is as complete from one initial as from all of the initials of such judge, and the voter should not be disfranchised by reason of the failure of such judge of election to literally comply with the statute in that regard. While the *statute* requiring such official indorsement *is mandatory* (Kelly v. Adams, 183 Ill. 193, 55 N. E. 837), the indorsement of *one initial is a substantial compliance with the statute, which is all that is required.*" (Our italics).

See also *Slenker* v. *Engel* (1911), 250 Ill. 499, 95 N. E. 618, 622, to the same effect.

Under a Nebraska election statute which required election judges to place their *names* upon the back of the ballots, the Supreme Court of Nebraska in *Griffith* v. *Bonawitz* (1905), 73 Neb. 622, 103 N. W. 327, *supra,* where a number of ballots were indorsed with the name of one of the judges and by the initials of another, at p. 329 said:

"There is only one class of ballots above mentioned which, in our opinion, call for special discussion. That is those that were indorsed by one judge of election, and by the initials of another. They are 26 in number, and may be regarded as in literal violation of what has been decided to be *a mandatory requirement* of the statute. They are not a violation of the statute, in strict literalness, or of its spirit, at all. In treating of the indorsement the statute uses the terms 'names' and 'signatures' interchangeably. A name is a word or words, designation or appellation, used to distinguish a person or thing or class from others, and words indicated by single letters are only less adapted to that purpose than words indicated by several letters. A signature is whatever mark, symbol, or device one may choose to employ as representative of himself." (Our italics).

In *Allen* v. *Fuller* (1928), 332 Ill. 304, 311, 163 N. E. 675, the Supreme Court of Illinois in holding that a ballot was not illegal because the full name was used when the statute required initials only, at p. 679 (N. E.), said:

> "The statute requires that the ballots shall be indorsed with the initial of one of the judges. Respondent's Exhibits 20, 23, and 24 were indorsed 'J. F. Steward,' and No. 27 was indorsed 'J. F. St.' The purpose of requiring the indorsement of a ballot by a judge of the election is to authenticate it as the ballot delivered to the voter. It is not shown how many of the ballots at this election were indorsed 'J. F. Steward,' or how many were indorsed by two of the judges; but, the purpose of the statute considered, no policy of the law is thwarted by the indorsement of the full name, instead of the initials. There is no question as to the ballots having been voted, and no reason is perceived why the voter should not have his wish, as expressed by his ballot, counted."

The Supreme Court of Kentucky in *Pardue* v. *Webb* (1934), 253 Ky. 838, 70 S. W. 2d 665, where a rubber stamp signature was used on ballots when the statute required one of the judges to sign his name on the back of each ballot, at p. 666, (S. W.) said:

> "The authorities agree that a form of signature prescribed by statute is not exclusive of any other method legally sufficient to accomplish the same result."

The question involved in *Turner* v. *Teller* (1925), Tex. Civ. App., 275 S. W. 115, although not concerned with absent voters' ballots, was identical to the one now before us, except that there the Texas statute provided that when a person presented himself at the polls to vote the judge should "deliver to him one official ballot on the blank side of which the presiding judge

shall have previously written his signature," and further provided that no ballots not bearing the signature of the election judge shall be counted. (No such provision is to be found in our statutes in connection with the requirement of the Indiana absent voters' law that the clerk shall attach his signature on all absent voters' ballots sent out from his office.) The presiding judge in one of the precincts in the Texas election did not indorse any of the ballots with his full name which was "F. A. Whitbeck", but indorsed all of them with his initials only, ":F.A.W." The ballots there were counted by the precinct officials, the commissioners'. court, and the district court. The question presented to the Court of Civil Appeals of Texas (San Antonio) was, should those ballots indorsed with the initials only and not with the full name of the presiding judge have been counted as legal ballots. Since the provision of the Texas statute is similar to that in our absent voters' law they are susceptible to the same construction. On the question here presented the Texas court, 275 S. W. at page 116, said:

"This and similar requirements in our statutes were enacted in order to prevent fraud. It is the duty of the courts, of course, to strictly enforce these provisions in every case to the point of rendering it certain that the purpose in view has been accomplished; but beyond that point those provisions should be liberally construed for the higher purpose of ascertaining and giving effect to the will of the electorate when expressed in good faith and in substantial compliance with the mandatory legislative requirements. In other words, the statutory enactments will be strictly enforced to prevent fraud, but liberally construed in order to ascertain and effectuate the will of the voters.

. . . . .

"This requirement will therefore be strictly enforced to the extent of invalidating every ballot

which does not appear to have been indorsed with the personal signature of the presiding judge. But, for the purpose of ascertaining if the requirement has in fact been complied with, it will be liberally construed, and therefore a substantial compliance is all that is necessary to give effect to ballots cast in good faith, so far as this provision affects their validity."[4]

The reasoning embraced in the above quotations is sound and applies with equal force to the question here under consideration.

The purpose of the requirement in the Texas statute was to make certain the identity of the ballot cast. That is also the purpose of the provision in the Indiana absent voters' law, and this court has so held. As to the purpose of this requirement the Texas court in *Turner* v. *Teller* (1925), Tex. Civ. App., 275 S. W. 115, *supra*, at p. 116, said:

"The specific purpose of the requirement in question is to make certain the identity of the ballot cast with that of the ballot handed to the voter at the time of voting. Identity may be said to be 'of the essence' of the provision. When the presiding judge in his own handwriting indorsed his initials upon the ballots, thus stamping them with his peculiar individuality, so that the other election officials could 'familiarize themselves' therewith, as provided in article 3011, the identification of the ballot became just as certain of ascertainment as if he had written his full name thereon.

. . . .

"Of course, the better practice is for election judges to indorse their full names upon the ballots, and they should not jeopardize the validity of those ballots and provoke election contests by doing less. Yet, when through indolence or by design, they

---

[4] See also—McCharen v. Mead (1925), Tex. Civ. App., 275 S. W. 117, 118.

adopt their initials only as their signatures, and indorse them on the ballots as their signatures, and the counting officials, looking upon them as such, 'familiarize themselves' therewith so as to enable them to identify the ballots passed out with those handed in, then the provision in question has been substantially complied with, the sole and full purpose and intention of the Legislature have been accomplished, and therefore the ballots should be counted as cast."

It may be said in the case at bar that the better practice would be for the county clerk to indorse his full name upon absent voters' ballots and if an action were filed prior to the time any ballots were sent out by the county clerk to require him to so do, a mandate would lie to compel him to affix his full signature, but when through his negligence or mistaken idea as to the manner in which this particular duty should be performed, the clerk uses his initials only as his signature and has them indorsed on all the ballots in exactly the same manner as and for his signature and the voter receiving the ballot and the election board officials who count the ballots look upon and consider the initials as the clerk's signature, and the election board officials familiarize themselves with such initials so as to enable them to identify the absent voters' ballots as being official, then it must be said that the requirement of this statute providing that absent voters' ballots must contain the official seal and signature of the clerk of the circuit court has been fully satisfied and the "full purpose and intention of the Legislature have been accomplished".

No fraud has been charged, or proven, in connection with the handling of these 527 ballots. On the record before us, everyone who has had any connection with these ballots has acted in good faith. In the face of this set of circumstances are we to disfranchise

527 legally qualified voters because the county clerk mistakenly affixed the initial letters of his signature to the absent voters' ballots instead of his full signature? We think this question was answered by this court in the quotation from *McArtor* v. *State, ex rel. Lewis* (1925), 196 Ind. 460, 148 N. E. 477, *supra.* See also *Black* v. *Smith* (1936), 209 Ind. 571, 574, 200 N. E. 215.

It is argued that since the voting by absent voters' ballots is a special privilege extended to this class of voters, a person availing himself of the privilege owes certain duties, among which is the duty to assure himself that the ballot he is about to vote is an official ballot. It is said in *Werber* v. *Hughes* (1925), 196 Ind. 542, 547, 148 N. E. 149, *supra,*

> "It is the duty of the voter on receipt of the ballot from the proper authority to examine it to see if it is official. In the sense that it has everything done to it which is prescribed by law, when the ballot comes into the hands of an absent voter it is an official ballot. If it lacks any of the statutory requirements of identification when it comes into the absent voter's hands, it is then lacking in some one or more of those things which are required to make it an official ballot."

What must the voter do to examine the ballot in order to determine whether or not it is official? If the ballot which he receives bears the seal of the clerk of the circuit court and a signature which, as many are, is indistinguishable, what is the duty of the voter? Must he, before accepting the ballot as official, secure what he knows to be an authentic signature of the county clerk and compare that with the signature on the ballot? The absent voter does have the duty of filling out his application for a ballot in the proper manner, seeing that it is properly authenticated and witnessed as

required by statute and of satisfying himself that the ballot which has been sent him is official, and that it is returned to the county clerk's office in time to be delivered to the voting place before the polls close on election day.

It must be conceded that a ballot "has everything done to it which is prescribed by law" if, when it comes into the hands of the absent voter it is sufficiently marked to safeguard its character and properly identify it as an official ballot.

When a ballot comes into the hands of a voter marked as are the ones here in question, with the seal of the clerk of the circuit court attached and the initial letters of the signature of the clerk affixed thereto, it cannot be said that such ballot lacks any of the statutory requirements of identification, when they have been considered and accepted as official ballots by the voter and have been so accepted and counted by the members of the election board to which they were returned.

The conclusion of this question must, therefore, be that the official seal of the circuit court and the initial letters of his signature were placed on all the 527 absent voters' ballots here in question in such a manner as to enable all of the 527 voters and all the members of the election boards in the 117 precincts in which such ballots were cast to identify them as official ballots. The statutory requirement for identifying and safeguarding the ballot having been fully satisfied, said ballots were legal valid ballots and if not invalid for other reasons should have been counted.

It is urged that there is no statutory authority for the clerk to authorize one Rex Ray, an election clerk, to sign his (the clerk's) initials on the back of absent voters' ballots. Said Ray testified that he was election clerk under Dwight L. Mathews, clerk of the St. Joseph Circuit Court, and had charge

of the work of receiving applications for and the issuing of absent voters' ballots and that the mailing of all absent voters' ballots was done under his supervision. Appellant then attempted to prove by this witness that the three letters, "D.L.M.", were placed on the ballots by him; that they were the initials of Dwight L. Mathews, clerk of the St. Joseph Circuit Court, that he was authorized and directed by Mr. Mathews to place his initials upon the corner of each ballot. Objections to all these questions were sustained. The trial court erred in sustaining these objections. The placing of the clerk's signature or initials upon an absent voter's ballot is purely a ministerial act and could be performed by an authorized agent of the clerk as well as by the clerk himself. Section 1-201(10), Burns' 1946 Replacement; *Ashwell* v. *Miller* (1913), 54 Ind. App. 381, 103 N. E. 37; *Reed* v. *City of Cedar Rapids* (1908), 138 Iowa 366, 368, 116 N. W. 140, 141.

Appellant was entitled to show by parol evidence that the initials appearing on said absent voters' ballots were those of the clerk of the circuit court.

We have examined and counted these 527 ballots and find that 340 properly marked ballots, without distinguishing marks, were cast for appellant and should be counted for her unless shown to be invalid for other reasons, and 104 of such ballots were cast for appellee and should be counted for him unless they are shown to be invalid for other reasons.

Having determined that said 527 ballots were not invalid because they were signed with the initial letters of the clerk's name instead of his full signature we must now consider three other questions raised as to the validity of some of them.

(1) 46 additional absent voters' ballots were voted and returned to the clerk's office but were not delivered to the polling places before the polls closed; they later

were opened, counted and tabulated by the Board of Canvassers. The question of the right of such board to count ballots was settled by this court in *State ex rel. Brown* v. *St. Joseph Circuit Court et al.* (1950), 229 Ind. 72, 76, 95 N. E. 2d 632, 634, *supra,* where we said:

> "The duties of a county canvassing board are ministerial only. It must take the ballots and return sheets and certificates thereto as turned over to it by the precinct inspector, and from these aggregate and tabulate the vote. *Kunkle* v. *Coleman* (1910), 174 Ind. 315, 321, 92 N. E. 61. The canvassing board has no right or authority under the statute to pass on irregularities or the legality of ballots."

Any qualified absent voter who returns his ballot to the (circuit court) clerk's office in time for it to be delivered to the voting place in the precinct before the polls are closed on election day and has satisfied all the statutory requirements with which he must comply, is entitled to have his vote counted, and if because of the failure of the county clerk or any other election official to do his duty, such ballot is not delivered to the inspector of the precinct in time for it to be counted by the precinct election board it will be counted by the court in an election contest proceeding. *McArtor* v. *State, ex rel. Lewis* (1925), 196 Ind. 460, 148 N. E. 477, *supra; Vincent* v. *Simms* (1934), 207 Ind. 47, 191 N. E. 150; *Boone* v. *Smith* (1948), 225 Ind. 617, 77 N. E. 2d 357; *Wood* v. *Hartman* (1943), 381 Ill. 474, 45 N. E. 2d 864, *supra;* McCrary on Elections, 4th Edition, §261.

To hold otherwise would be to open the door for an unscrupulous clerk to hold absent voters' ballots in his office beyond the time when they could be delivered to the precinct voting places and thereby disfranchise voters and control the results of an election.

Appellee contends that of said 46 ballots, 22 which were cast for appellant were void by reason of distinguishing marks, illegible seals or no seals at all or other disqualifying defects, and 5 such were cast for appellee; that there were actually 49 ballots instead of 46, and that 41 were cast for appellant and 8 for appellee, deducting 22 void ballots from appellant's 41 and 5 void ballots from appellee's 8, leaves 19 valid votes for appellant and 3 for appellee. If we accept the contention of appellee as to these ballots a total of 19 should be added to the vote of appellant and 3 to the vote of appellee.

(2) Appellee contends that there are 211 absent voters' ballots that are invalid and illegal because of improper applications but it cannot now be ascertained for whom they were cast because the envelopes have been separated from the ballots.

Public officials are presumed to do their duty and this presumption extends to election officials. *Vincent v. Simms* (1934), 207 Ind. 47, 191 N. E. 150, *supra; Henry v. Oklahoma City* (1940), 188 Okla. 308, 108 P. 2d 148, 155; *McDonald v. Koths* (1933), 63 N. D. 716, 249 N. W. 706, 707.

The statute[5] sets out the grounds upon which absent voters' ballots may be challenged.

There is no evidence that any of these ballots were challenged by party challengers, any member of the election boards or anyone else. They were accepted and counted by the judges and inspectors of the various boards as being legal ballots and under such circumstances they will be considered *prima facie* legal. Before they will be thrown out by a court as being illegal, the presumption of legality must be

---

[5] Section 29-4915, Burns' 1949 Replacement; Acts 1945, ch. 208, §208, p. 680.

overcome by competent evidence; *Vincent* v. *Simms* (1934), 207 Ind. 47, 53, 54, 191 N. E. 150, *supra; Mc-Cormick* v. *Wall* (1930), 201 Ind. 439, 441, 168 N. E. 454; *Parvin* v. *Wimberg et al.* (1892), 130 Ind. 561, 565, 572, 30 N. E. 790, 15 L. R. A. 775, *supra; Tuthill* v. *Rendleman* (1944), 387 Ill. 321, 336, 56 N. E. 2d 375, 383; *Wilson* v. *Kennedy* (1949), 151 Ohio St. 485, 86 N. E. 2d 722, 724; *Goar* v. *Brown* (1921), 82 Okla. 227, 200 Pac. 156, 157; *Woodall* v. *Western Wake Highway Commission* (1918), 176 N. C. 377, 97 S. E. 226, 232; 18 Am. Jur., Elections, §303, p. 375; McCrary on Elections, 4th Ed. §466a p. 342; and, in the absence of any showing by the party claiming the illegality, and failing to show that such ballots were cast for his opponent, they will be counted as tabulated by the election board for the party for whom they were cast. *McCormick* v. *Wall* (1930), 201 Ind. 439, 441, 168 N. E. 454, *supra; Humphries* v. *McAuley* (1933), 205 Ind. 469, 187 N. E. 262.

The court of appeals of Kentucky had before it a similar question, in *Napier* v. *Cornett* (1902), 24 Ky. Law Rep. 576, 68 S. W. 1076, where the trial court in an election contest attempted to purge the returns of illegal votes where the evidence did not show for whom they were cast, and 68 S. W. at p. 1077, said:

"It is sufficient to say that a careful examination of the evidence shows that irregularities occurred in all the precincts of which complaint is made on either side. But we cannot say that they are sufficient to justify us in throwing out the precincts, under the rule laid down in Banks v. Sergent (Ky.) 48 S. W. 149. As a rule, except in two of the precincts, the irregularities were trivial, and such as resulted naturally from holding elections with the insufficient accommodations afforded by country school houses. Except in Lost Creek precinct, which returned a vote of 76 to 9 in favor of contestant, there seems to be no specific evidence

of fraud or violence. In that precinct there seems to have been little pretense of propriety, and in one of the other precincts, which showed an almost equal disparity in the vote in favor of contestee, the proceedings were not very much better. But, if both these precincts were thrown out entirely, it would not change the result of the election. In one respect the election law was not observed at any of the five precincts concerning which testimony was introduced, and this was as to the voting of illiterates. In some of the precincts they seem not to have been sworn at all as to their disabilities. In the others there is conflict of testimony upon that point. In all the precincts there were some of these votes as to which there was some testimony that they were voted openly, with the aid of the officers. The circuit judge undertook to deduct those votes which were shown to have been voted openly, and as to which the testimony showed for whom they were cast, from the vote of the candidate who had obtained the benefit of them. This was correct, and in accord with the rule laid down in Major v. Barker, 99 Ky. 305, 35 S. W. 543. Votes so cast were illegal, and the returns should be purged thereof, if possible. But the court applied the rule laid down in McCrary, Elect. §495, in purging the returns of the illegal votes shown to have been thus cast, but as to which the testimony did not show for whom they were cast, by deducting them proportionately from both candidates, according to the entire vote returned for each. It is suggested that the case of Major v. Barker furnishes authority for this rule in this state. This is an error. In that case the testimony of the clerk who marked the ballots showed for what candidate he marked them. After full consideration we have concluded that the rule laid down in McCrary is unsafe, and it not applicable to a case like this, where it is not shown to be impossible, by the use of due diligence, to show for whom the illegal votes were cast; and that is the only class of cases to which McCrary holds that rule should be applied. He says: 'Let it be understood that we are here referring to a case where it is found to be impossible by the use of due diligence to show for whom the illegal votes were cast. If

in any given case it be shown that the proof was within the reach of the party whose duty it was to produce it, and that he neglected to produce it, then he may well be held answerable for his own neglect; and because it was his duty to show for whom the illegal votes were cast, and because he might, by the use of reasonable diligence, have made this showing, it may very properly be said that he should himself suffer the loss occasioned by deducting them from his own vote.' The presumption is in favor of the regularity and authenticity of the returns. The burden is upon the contestant to overcome that presumption. For whom a ballot voted openly on the table of the election officers was cast is a matter susceptible of proof. It was marked in the presence of the officers. They are at liberty to testify to the manner in which it was marked; and, as the vote was illegal, the voter himself, as we have held in Tunks v. Vincent (Ky.) 51 S. W. 622, is not exempted by the election law from testifying for which candidate he cast it. We concur with Judge McCrary that 'the ordinary principle which requires the party holding the affirmative to prove the facts, and all the facts, necessary to make out his case, is the better rule, and that it will in all cases be safer to follow it.' The contestant has the burden, and that burden was only partially sustained by showing that illegal votes were cast. In order to make out his case, he must show for whom they were cast."

This court said in *McCormick* v. *Wall* (1930), 201 Ind. 439, 168 N. E. 454, *supra,* at p. 441,

"The mere fact that illegal votes were cast is unavailing to the party so claiming, unless it is shown, either by direct or circumstantial evidence, that his opponent received them. 20 C. J. 247, Sec. 341."

In *Humphries* v. *McAuley* (1933), 205 Ind. 469, 187 N. E. 262, *supra,* 182 persons voted in one precinct where, because of a defect in the voting machine, the votes were not tabulated or counted. No evidence was

presented to show for whom these 182 votes were cast. This court 205 Ind. at p. 480 said:

"... instant case, the contestor having the burden of proof, it was his duty to establish by legal evidence that he received the highest number of votes cast for sheriff, and until he established by evidence for whom the 182 voters cast their ballots he failed to prove that he received the highest number of votes cast for the office of sheriff of Delaware county."

The rule here laid down by the Kentucky Court of Appeals and by this court is sound and should be applied to the similar set of facts here under consideration.

The burden of establishing the invalidity of these 211 votes was upon the party contesting them, in this case the appellee. He has not only failed to overcome the presumption of legality with which they were clothed, but has failed to show for whom they were cast or in the absence of such showing, why by the use of reasonable diligence it could not have been done. Under such circumstances these ballots will be counted for the person for whom they were cast.

(3) Appellant contends that 31 absent voters' ballots which were cast in Portage A precinct were void because they were not signed by two resident freehold voters of the precinct. Section 24 of ch. 120, Acts of 1947, p. 364, being §29-4903, Burns' 1949 Replacement provides:

"Except as otherwise provided in section one hundred and ninety-seven (197) of this act,[6] the application shall be signed and sworn to by two (2) legal, resident freehold voters of the precinct in which the applicant resides and intends to vote."

[6] This exception applies to federal or state government employees, members of the armed forces or merchant marine. §29-4904, Burns' 1949 Replacement.

Said section then proceeds to set out a form of application for absent voters' ballots which shall be used. That part pertaining to legal freehold voters is as follows:

"We, the undersigned legal freehold voters residing in the same precinct as the applicant for his absent voter's ballot, certify that we are resident . freehold voters of said precinct and that we are personally acquainted with said applicant and that the above statements are to our personal knowledge true."

This is followed by lines for signatures and addresses of the voters so signing.

The above provision is one of the duties which is imposed upon the voter and its purpose is to identify the voter as a resident of the precinct, to verify the statements made in the application and to furnish proof that such applicant is entitled to be given an absent voter's ballot. Being a requirement to be performed by the voter in order that he may secure an absent voter's ballot it is mandatory and unless performed the application is void, and an absent voter's ballot issued upon a void application is illegal and should not be counted. None of these 31 ballots were contested or challenged by the precinct election board in Portage A precinct as being illegal because of a defective application. Because of this action of the election board such ballots are presumed to be legal unless that presumption is overcome by competent evidence.

Appellant has, however, by the introduction of evidence, sustained her contention that said 31 applications were not signed by 2 resident freehold voters of the precinct. One Thomas J. Brennan testified that he and Francis J. O'Malley signed said 31 applications on October 9, 1950, representing

that they were legal freehold voters of the precinct; that at the time he signed the application he did not own any real estate in Portage A precinct of St. Joseph County, and that at that time he had no interest in any real estate in St. Joseph County. This evidence was sufficient to overcome the presumption of legality arising by reason of the counting of the ballots by the precinct election board. These ballots were illegal and invalid and should not have been counted. It was determined that of said 31 ballots 3 were thrown out because of distinguishing marks, 26 were voted for appellee and 2 for appellant. Of the 28 votes counted by the precinct election board 26 should be deducted from the total of appellee and 2 from the total of appellant.

It is stipulated that the machine vote was:

| | |
|---|---:|
| Appellant _____ | 40,208 |
| to which must be added valid absent voters' ballots cast for appellant (of the 46 _____ 19) (others _____ 340) . | |
| total _____ | 359 |
| Total for appellant _____ | 40,567 |
| Deduct void ballots in Portage A_____ | 2 |
| Net total vote for appellant_____ | 40,565. |
| Machine vote for appellee_____ | 40,391 |
| to which must be added valid absent voters' ballots cast for appellee (of the 46 _____ 3) (others _____ 104) | |
| total _____ | 107 |
| Total for appellee _____ | 40,498 |
| Deduct void ballots in Portage A_____ | 26 |
| Net total vote for appellee_____ | 40,472. |

Appellant having received a majority (93) of the votes cast, she is elected.

Because the decision of the lower court is contrary to law it is reversed with instructions to enter judgment for appellant.

Emmert, J., not participating.

Jasper, J., dissenting.

NOTE.—Reported in 101 N. E. 2d 639.

## DISSENTING OPINION

JASPER, J.—The majority opinion says that three questions determine the outcome of this action. There then follows a discussion of the three separately numbered questions. However, the majority opinion then decides an unnumbered fourth question, namely, did the trial court err in sustaining the objections to certain questions propounded? It was necessary for the court to decide this fourth proposition to accomplish the result arrived at in the majority opinion.

I concur in the majority opinion as outlined in its discussion of the first and second questions and the results reached. However, I dissent to the third question. I also dissent to the holding of the majority opinion that the objections to certain questions were erroneously sustained by the trial court. The majority opinion states the third question to be decided as follows:

> *"Third:* Were the absent voters' ballots illegal because they bore only the initial letters 'D.L.M.' of the clerk's name instead of his full signature?"

My answer to this question is "Yes," for the following reasons: It is uncontradicted that the appellee received a majority of 183 votes on the machines. It

is therefore clear that appellant was not elected unless she received enough valid, legal absent voters' votes to change the result shown by the machines. It is appellee's contention that none of the 527 absent voters' ballots were valid, and none should be counted for either candidate. The contention of appellee in this action is based upon §29-4907, Burns' 1949 Replacement, which provides, in part, as follows:

> "Before mailing or delivering any ballot the clerk shall affix his official seal and place *his signature* near the lower left hand corner on the back thereof leaving sufficient space on the margin of such ballot for the *initials* of the poll-clerks." (Emphasis supplied.)

The signature of the Clerk of the Circuit Court of St. Joseph County does not appear on the back of any of the absent voters' ballots cast. There does, however, appear the initials "D.L.M." The question to be decided is: Were these legal, valid, votable absent voters' ballots under the last-cited section of the statute?

Previously this court has recognized as the law that absentee voting is an exception to the general rule, and is in the nature of a special right or privilege, which enables the absentee voter to exercise his right to vote in a manner not enjoyed by voters generally. It is a privilege which is purely optional with the absentee voter. If he decides to exercise this special privilege, he can do so only by complying with the provisions of the Absent Voters' Law. It has been the law that absent voters' statutes are to be construed as mandatory in all their substantial requirements, and are an exception to the general rule that election laws are construed liberally in favor of the electors. *Brown* v. *State ex rel. Stack* (1949), 227 Ind. 183, 84 N. E. 2d 883, and authorities cited. Previously, this court has held, in the case of *Werber* v. *Hughes* (1925), 196 Ind.

542, 148 N. E. 149, that the language identical to this particular statute was mandatory and not directory. In that case, the court had before it section 5, chapter 156, Acts of 1919, which is identical with the language used in §29-4907, Burns' 1949 Replacement, *supra*. The court said (pp. 547, 548 of 196 Ind., p. 151 of 148 N. E.) :

"That provision of the absent voter's law which requires that each ballot, before being sent to the applicant, shall have upon the back of the ballot the *signature of the clerk of the court and also the seal of the court,* is for a double identification and is for the express purpose of the purity of the ballot. It is the duty of the voter on the receipt of the ballot from the proper authority to examine it to see if it is official. In the sense that it has everything done to it which is prescribed by law, when the ballot comes into the hands of the absent voter it is an official ballot. If it lacks any of the statutory requirements of identification when it comes into the absent voter's hands, it is then lacking in some one or more of those things which are required to make it an official ballot. Upon receipt of the ballot and finding that it was not official, the voter should have returned it and asked for a properly prepared official ballot. . . .

"Were the failure to affix the official seal to the ballot an irregularity of the absent voter, in that such irregularity did not tend to affect the result of the determination and selection by the voter of those for whom he voted, and thereby possibly have to do with the defeat of the majority, such failure to affix the official seal might then be held to be directory. *The act however was enjoined by the law to be performed by the clerk of the court, and because it was an act to identify the ballot, it is mandatory.*" (Emphasis supplied.)

After the decision in *Werber* v. *Hughes, supra,* the Legislature reenacted this section of the Absent Voters' Law in 1945. It is the law that when a statute or section has been judicially construed by a court of last

resort, and thereafter the Legislature reenacts the same statute or section, the Legislature will be deemed to have used the language as intending to mean the construction placed upon it by the court. *Boone* v. *Smith* (1948), 225 Ind. 617, 77 N. E. 2d 357. The Legislature reenacted this section as a mandatory section and requirement by the clerk of the court as an identification of the ballot; in other words, as an act necessary to make the ballot a legal, valid, votable, official ballot. Without the signature of the clerk it could not be a legal ballot.

In *McCardle* v. *Holcomb* (1939), 216 Ind. 267, 23 N. E. 2d 470, five absent voters' ballots were in question. They bore the seal of the clerk of the circuit court and his signature, "D.D. Morgan," without any designation that the latter was the clerk. However, he was the clerk, and the signature upon the ballots was actually his personal signature. This court again said that the purpose of this statutory provision is to safeguard and identify ballots delivered or sent out for the use of absent voters. In that case this court said (p. 269 of 216 Ind., p. 470 of 23 N. E. 2d):

> "It cannot be doubted that a ballot *signed by the clerk with his own personal signature,* and bearing the official seal of his office, is sufficiently authenticated to provide the protection desired. . . ." (Emphasis supplied.)

This court, in the last-cited case, recognized that it was necessary that the ballot be signed by the clerk with his own personal signature. In the case of *Brown* v. *State ex rel. Stack, supra,* the court said (p. 192 of 227 Ind., p. 886 of 84 N. E. 2d):

> "Each absent voter's ballot must contain on the back thereof the signature of the clerk and his official seal, which thus identifies the ballot as an absent voter's ballot when the same is counted."

It would seem to the writer of this opinion that these cases thoroughly established as the law of this state that the Legislature mandated the signature of the clerk on the back of an absent voter's ballot before it became a legal, valid, votable, official ballot, and that consistency requires this court to hold that if the absent voters' ballots lack the signature of the clerk of the circuit court, they lack one of the essential requirements to make them legal, valid, votable ballots, and that without the signature they should not have been counted.

 *Werber* v. *Hughes, supra,* is cited with approval in the case of *Dobbyn* v. *Rogers* (1948), 225 Ind. 525, 76 N. E. 2d 570.

 The Legislature has provided that, in construing statutes, words and phrases are to be taken in their plain, or ordinary and usual, sense. Section 1-201, Burns' 1946 Replacement.

 In this state there is a long line of decisions holding that, where a statute requires a public officer or person to affix his signature, or to subscribe a document, at least the whole surname should be used. In the case of *Vanderkarr* v. *State* (1875), 51 Ind. 91, the statute involved required the signature of the prosecuting attorney, and this court held that this meant the signature by the surname in full and the Christian name by at least its initial. In the case of *Collins* v. *Marvil et al.* (1896), 145 Ind. 531, 44 N. E. 487, this court, in passing upon the question as to what was sufficient to meet the statute requiring the signing of a remonstrance, held that one might employ his initials to indicate his Christian name in subscribing a remonstrance, provided he write his surname in full. In the case of *Ardery* v. *Smith* (1905), 35 Ind. App. 94, 97, 73 N. E. 840, 841, the Appellate Court, relying on the

definition of "signature," as contained in Bouvier's Law Dictionary, defined it as:

"The act of putting down a man's name at the end of an instrument, to attest its validity."

In the case of *Good* v. *Burk* (1906), 167 Ind. 462, 77 N. E. 1080, there was involved a statute requiring a petition to be "signed" by twenty-five freeholders of the township. This court held that it was sufficient if the petitioners used the initial letter of their Christian name, provided they signed their surnames in full. In the case of *Old Wayne, etc., Assn.* v. *McDonough* (1905), 164 Ind. 321, 73 N. E. 703 (reversed 204 U. S. 8, 27 S. Ct. 236, 51 L. Ed. 345, on other grounds), the court approved the *Vanderkarr Case, supra,* and, in passing upon the question of what was sufficient for the signature of the clerk and the signature of the judge on the transcript, held that it was sufficient if the surname was signed in full and the initial used for the Christian name. Webster's New International Dictionary, Second Edition, defines "initial" as "the initial letters of an individual's name and surname."

Upon the question of the intention of the Legislature, it has emphasized the distinction between initials and signature in the same sentence by referring to the "signature" of the clerk and the "initials" of the poll-clerks. Section 29-4907, Burns' 1949 Replacement, *supra.* We must therefore assume that a different meaning was attached to the two expressions, and that when the Legislature required the signature of the clerk and only the initials of the poll-clerks, it meant to require of the clerk something different from and greater than was required of the poll-clerks. The Legislature has further emphasized this distinction, by contrasting the requirement of signature of the clerk and

only the initials of the poll-clerks, in §29-4914, Burns' 1949 Replacement, when it said:

"The inspector shall then deliver such ballot or ballots to the clerks, who shall at once proceed to write their *initials,* above the *signature of the clerk of the circuit court.* . . ." (Emphasis supplied.)

It is for the Legislature alone to say what procedural safeguards shall be erected around the right to vote by absent voter's ballot to the end that the integrity and purity of elections shall be assured. This court has no right to strike down by judicial construction any of the legal safeguards so erected by the Legislature. As heretofore said, after the Legislature has taken a judicial construction of this court, applied it to a statute, and reenacted the statute, it carries the judicial construction of this court. If the rule laid down by this court in *Werber* v. *Hughes, supra,* and the cases which follow it, and the long line of decisions above referred to, upon the question of "signature," when required by statute of a public officer or person, are to be overruled, it should be done by the *Legislature,* and not by this court. This court has no right, and justly so, to legislate; and the court, whose duty it is to maintain inviolate the three branches of government, should not by its construction break down the three separate branches of government, as done in the majority opinion. The law, as laid down in the cases above cited, and the legislative action based thereon, should not be changed by forced construction to meet a particular case. There is no contention in *Werber* v. *Hughes, supra,* that the five absent voters' ballots in question, which were declared illegal and void, did not in fact issue from the clerk's office, that those who attempted to vote them were not legal voters, or that any fraud had been practiced. Neither were any of

these ballots challenged in the precinct. Yet this court held in that case that said ballots could not be counted. That decision should not be changed by construction at this time to arrive at a particular result in a particular case.

While the majority admitted that they did not intend to overrule the case of *Werber* v. *Hughes, supra,* the result of the majority opinion could only be arrived at by applying a rule contrary to the law as laid down in that case. The majority opinion must overrule *Werber* v. *Hughes, supra,* to have arrived at its result. The upholding of the provisions of the election laws, and keeping the opinions of this court consistent, is far more important than the result of a particular case.

The majority opinion has cited, and relies upon, the case of *Pardue* v. *Webb* (1934), 253 Ky. 838, 70 S. W. 2d 665. However, the Kentucky court, later, in the case of *Brandenburg* v. *Hurst* (1942), 289 Ky. 155, 158 S. W. 2d 420, had occasion to pass upon the question of the statutory requirement of a signature, and said (pp. 156, 157 of 289 Ky., p. 421 of 158 S. W. 2d) :

> "Our interpretation of the quoted provision of Section 1460 of the Statutes is that it is mandatory and the full name or the initials and surname of one of the judges of the election must be signed; *that the mere initials or the given name without the surname or the surname without the initials or given name is not* sufficient." (Emphasis supplied.)

Section 196 of the Election Code (§29-4903, Burns' 1949 Replacement) provides that applications for absent voters' ballots "shall be *signed* and sworn to by the applicant, as hereafter provided, before some officer authorized by law to administer oaths and having an official seal." (Emphasis supplied.) Under the holding in the majority opinion, it would be sufficient if the

applicant for an absent voter's ballot merely placed his initials thereon. The election law then provides that when the absentee voters' ballots have been voted and returned to the county election board in the prescribed envelopes, the county election board is required to examine the "signature" on each envelope and compare it with the "signature" of the voter "as it appears and is written upon the application for such absent voter's ballot or ballots on file as herein provided." Section 29-4911, Burns' 1949 Replacement. Under the opinion of the majority of the court, the applicant for absent voter's ballot can merely place his initials thereon and then have the same notarized, and wherever a signature is required in election laws initials will suffice. It would logically follow that registration forms could be signed by initials, and it would be sufficient if only the initials of the voter appear upon the registration lists furnished to the precinct boards.

For the reasons given, I am compelled to dissent from the majority opinion. It is my opinion that none of the 527 absent voters' ballots were valid, votable ballots, and that none of the absent voters' ballots should have been counted for either appellee or appellant.

The fourth proposition, although unnumbered but decided by the majority opinion, was to the effect that the trial court committed error in sustaining objections to certain questions. The following question was asked:

"You may state when Mr. Matthews appointed you to do this work, whether he directed and authorized you to initial each ballot in that manner."

The majority opinion holds that the trial court erred in sustaining an objection to the question. It is well settled in this state that where evidence is excluded

by the trial court, the ruling will stand on appeal if sustainable on any valid theory, whether advanced at the time of the ruling or not. In *Eckman* v. *Funderburg* (1915), 183 Ind. 208, 210, 108 N. E. 577, 578, this court said:

> "It has been held that where evidence is excluded by the trial court, the ruling will stand on appeal if sustainable on any valid theory, whether advanced at the time of the ruling or not. *Abshire* v. *Williams* (1881), 76 Ind. 97, 103; *Fisher* v. *Allison* (1874), 46 Ind. 593; *Haas* v. *Cones Mfg. Co.* (1900), 25 Ind. App. 469."

It seems clear that the above question was objectionable and incomplete. It called for a conclusion, it assumed facts, and it sought to prove agency by the conclusion of the alleged agent.

Another question was propounded:

> "Do you find three letters or initials on the backs of these?"

This question referred to certain absent voters' ballots. While the question may have been preliminary, it called for the contents of a written instrument which was in evidence, and the trial court did not err in sustaining an objection thereto.

Even on the theory of the majority opinion that initials are the equivalent of a signature, it is necessary that they be placed on the absent voter's ballot by the clerk of the circuit court, or some one whom the law recognizes as being authorized to do so. There is no contention that the man placing the signature upon the absent voters' ballots was a deputy clerk. The majority opinion is predicated on the assumption that he was an authorized agent, and that such act could be performed by an agent other than a deputy. There was no evidence offered to prove that the man was appointed

in writing, that his appointment and oath, if any he took, were recorded in the order book, nor does it appear that the ballots were initialed by the man in or out of the presence of the clerk.

For the reasons herein given, it is my opinion that the judgment of the trial court should be affirmed.

NOTE.—Reported in 102 N. E. 2d 372.